**CHICORA COMMONS LIMITED PARTNERSHIP, LLP,**
Appellant

v.

**CHICORA BOROUGH SEWER AUTHORITY.**

Commonwealth Court of Pennsylvania.

Argued Feb. 5, 2007.
Decided April 27, 2007.

---

Bruno A. Muscatello, Butler, for appellant.

Donald P. Graham, Cranberry Township, for appellee.

BEFORE: COLINS, Judge, McGINLEY, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge McGINLEY.

Chicora Commons Limited Partnership (Partnership) appeals the order of the Court of Common Pleas of Butler County (trial court) which denied the post-trial motion of the Partnership after the trial court determined that the Chicora Borough Sewer Authority (Authority) properly classified and billed the Partnership for twenty-seven Equivalent Dwelling Units (EDU) for its twenty-seven apartment units within its single metered multi-unit apartment building. The trial court determined that the Partnership owed the Authority for additional tapping fees of 19.5 EDU's at $1,200.00 per EDU and awarded the Authority $23,400.00.

1. The Commonwealth of Pennsylvania, Department of Environmental Protection compelled the service under the Pennsylvania

The Authority was formed in 1992, to provide sewage service for all of Chicora Borough and small portions of Fairview and Donegal Townships.[1] On June 10, 1998, the Authority adopted user rates and tapping fees for the new public sanitary sewage system. After October 1, 1998, a tapping fee was set at $1,200.00.

The Authority's June 10, 1998, Rate Resolution set a service charge of $40 per month for each EDU. The June 10, 1998, Rate Resolution established three user classifications: residential, commercial, and industrial.

An EDU, with respect to a residential customer, was defined as any room, group of rooms or enclosure, occupied or intended for occupancy as separate living quarters for a family or other group of persons living together or by persons living alone.

An EDU with respect to a commercial customer was defined as any office, store, shop, restaurant, club, tavern, barber or beauty shop, service station, funeral home, or other similar commercial establishment selling a product or rendering a service, or any religious or fraternal or governmental establishment.

In the case of motels, hotels, and schools, an EDU was defined as each 54,000 gallons or less of water used per year. An EDU with regard to an industrial customer was defined as each 54,000 gallons or less of water used per year at any industrial establishment.

The June 10, 1998, Rate Resolution did not specifically classify or define a category for separate units within an apartment building. Section H.6 of the Rules and

Sewage Facilities Act, Act of January 24, 1966, P.L. (1965) 1535, 35 P.S. §§ 750.1—750.20a.

Regulations of the Authority, dated January 15, 1998, provides [2]:

6. Multi–Unit Buildings with Single Meters

All owners of property having a multi-unit building or buildings thereon, which shall include but not be limited to, buildings with more than one apartment or living quarters and/or buildings with more than one business establishment, presently having one water meter shall be metered at the current rates in the following manner:

(a) Total meter reading in gallons shall be divided by the number of units in the building, thereby establishing the average reading in gallons per unit. The average reading shall be applied to the current schedule of rates for sewage service thereby established in the schedule of rates for the Authority. The cost, in turn, shall be multiplied by the number of units in the building as established above to establish the bill to be rendered to the owner of the property.

The Partnership's building contains twenty-seven apartments. Each apartment contains one fully equipped bathroom, one kitchen with a sink, one bedroom, and a living/dining area. With the exception of one unit, each unit is occupied by one person. By government regulation, the units are occupied by persons fifty-five years of age or older with low to very low income.[3] There is a common laundry facility and another common area that contains a kitchen, dishwasher, and two restrooms. The Partnership is billed for water usage on a metered basis. The building has one water meter and one tap to the sewer line.

The Partnership brought a civil complaint in the trial court and challenged the reasonableness of the Authority's rates. The Partnership asserted:

12. The amount Defendant [Authority] intends to charge Plaintiff [the Partnership] per EDU is unreasonable in proportion to the value of service Plaintiff [the Partnership] receives from Defendant [Authority].

13. Defendant [Authority] has caused a discriminatory and arbitrary classification of customers, of which Plaintiff [the Partnership] is the sole customer in its class because Plaintiff [the Partnership] is the only customer who operates a multi-family high rise complex for older persons.

14. Defendant's [Authority] decision to place Plaintiff [the Partnership] in its own rate classification is arbitrary and for which no rational reason exists.

15. Defendant [Authority] will charge Plaintiff [the Partnership] based on EDU's that are neither reasonable nor accurate given the nature of Plaintiff's [the Partnership] business, and as a result Plaintiff [the Partnership] is

---

**2.** In addition, Section F.3(a)(iii) of the Rules and Regulations provides for the establishment of the capacity part of a tapping fee:

(a) Capacity Part. The Authority hereby establishes the following as the capacity part of the tapping fee:

. . . .

(iii) Whenever any multi-family residential dwelling, including but not limited to duplexes, townhouses, garden apartments, high-rise apartment buildings, zero lot line houses, four-plexes, conversion apartments and trailer parks, makes application for connection to either the sanitary sewer system, the number of equivalent dwelling units shall be determined by establishing the number of separate residential areas contained in the multi-family building or buildings. The number of equivalent dwelling units shall then be multiplied by the sewage capacity fee to determine the capacity part of the tapping fee.

**3.** The average annual income of a resident is $12,000.00. The lowest income of a resident is $7,300.00 and the highest is $19,000.00.

charged for more effluent than actually will enter the system.

. . . .

20. Because Defendant's [Authority] rates are unreasonable and non-uniform, the revenue Defendant [Authority] will derive from Plaintiff [the Partnership] is far in excess of the amount Defendant [Authority] estimated was required to fund its sewer system's operations.

Complaint—Civil to Review the Reasonableness of Rates Set by the Chicora Borough Sewer Authority, November 12, 1999, Paragraph Nos. 12–15 and 20, at 3–4; Reproduced Record (R.R.) at R–5–R–6.

The Partnership sought a declaration that the tapping fees and service charges were improperly calculated, unreasonable, arbitrary, discriminatory, invalid, and unconstitutional. The Partnership further sought the establishment of reasonable and proper rates for the tapping fees and service charges.[4]

On December 5, 2005, the trial court conducted a bench trial. Perry O'Malley, executive director of the Housing Authority of the County of Butler (Housing Authority), testified that the Partnership was a limited partnership composed of the general partner, Butler Area Housing Rehabilitation, Inc., a non-profit corporation formed by the Housing Authority, and a limited partner, Apollo Capital, an entity that purchases tax credits that are awarded to the development by the state financing agency. Notes of Testimony, December 5, 2005, (N.T.) at 36–39; R.R. at R–55–R–58. The Housing Authority provides

management and maintenance services for a fee. N.T. at 42; R.R. at R–61.[5]

John Callihan (Callihan), president of the Authority, testified regarding its financial structure. Callihan testified that through December 31, 2001, the Authority earned net income of $74,000, and through June 30, 2002, the Authority earned net income of approximately $54,000. N.T. at 101–103; R.R. at R–120–R–122. In the budget summary from January 1, 2005, through November 30, 2005, the net income year to date for the Authority was $77,547.41. N.T. at 104; R.R. at R–123. For the balance sheet dated December 31, 2001, the Authority had $204,000 in restricted cash and $75,000 in unrestricted cash. N.T. at 105; R.R. at R–124. On cross-examination, Callihan further explained that the Authority was required to establish a reserve for repair and replacement of facilities. N.T. at 114; R.R. at R–133. Further, the Authority's loan documents required that it keep one year's debt service plus an additional ten percent, a total of $202,000. Although the November 30, 2005, balance sheet listed net income of $77,547, there was a debt payment of $92,000 forthcoming. N.T. at 114; R.R. at R–133.

David Schnur, controller for the Housing Authority, testified that based on the cost per EDU actually consumed, the Partnership overpaid approximately $49,000 for sewage in one year. N.T. at 133; R.R. at R–152.

John Graham (Graham), secretary/manager for the Authority, explained the classification of customers as industrial, resi-

---

4. Pursuant to a consent order of court dated December 23, 1999, the Partnership paid the Authority for 7.5 EDU tapping fees even though it had only one tap to the sewer line and was ordered to pay one EDU per month for each occupied dwelling until further order of court. The Authority charges the Partnership as a residential customer at the rate of

$40.00 per month per unit or $40.00 × 27 units.

5. Sandra Reges, operations manager of the Housing Authority, explained the age and income restrictions for residents as well as the Section 8 rent subsidy program.

dential, or commercial. Graham testified that when the Authority received applications for multi-family dwellings, the tap in fee was based on the number of EDUs within the building. N.T. at 156–157; R.R. at R–175–R–176.

The trial court determined that the Authority properly classified and billed the Partnership for twenty-seven EDUs based on the twenty-seven units within the single metered building. The trial court determined that the classification and billing were not arbitrary or unfair. The trial court awarded the Authority $23,400 for additional tapping fees for 19.5 EDUs at $1,200.00 per EDU. The trial court made the following relevant finding of fact:

29. According to Chicora Commons' water usage, as metered, the billing calculation for sewage services as defined in the January 15, 1998 Rules and Regulations of the Authority, § H.6, the number of billable EDUs for the facility would also equal 27. For example: In the year 2000, Chicora Commons used a total of 168,100 gallons of water. Under § H.6 of the Rules and Regulations, 168,100 gallons is divided by the number of units in the building, i.e., 27. When that is done, the average water usage per apartment equals 6,226 gallons of water. That in turn equals 1 EDU per unit. The rate resolution defines an EDU based upon water usage as 54,000 gallons of water or less per year. Thus, the average use per apartment is less than 54,000 gallons per year, thus each apartment is 1 EDU. That means 27 units times $40.00 per month. The result is the same regardless of classification as a Residential or multi-use apartment. The same calculations for all years through 2004 will yield the same result.

Trial Court Opinion, February 10, 2006, (Opinion, 2/10/06), Finding of Fact No. 29 at 6–7; R.R. at R–280–R–281.

The trial court made the following relevant conclusions of law:

4. The Municipal Authorities Act authorizes the Authority to 'fix, alter, charge and collect rates and other charges in the area serviced by its facilities at reasonable and uniform rates to be determined exclusively by it for the purpose of providing for the payment of the expenses of the Authority, the construction, improvement, repair, maintenance, and operation of its facilities and properties ...' 52[53] Pa.C.S .... [§ ]5607(d)(9).

5. The Authority may create classifications of users as long as the charges are uniform within the classification, and are reasonably proportional to the services rendered....

6. The Authority has uniformly classified and charged all apartment buildings as Residential Customer's [sic], 1 EDU per unit, since 1998.

7. The charges of the Authority cannot be overturned unless there is a manifest and flagrant abuse of discretion or arbitrary establishment of a rate system....

8. The Authority's classification and billing is not arbitrary. The June 10, 1998 Rate Resolution clearly provides definitions for EDUs and the January 15, 1998 Rules and Regulations provide a mathematical calculation for determining the appropriate sewage rate. The classifications and calculations have been uniformly applied since their inception in 1998.

9. The mere non-use of service however, is not an appropriate basis to alone challenge the reasonableness of the rate structure....

10. Flat rate sewer rentals are not unreasonable provided that they reasonably relate to the value of services rendered.... (Citations omitted).

Opinion, 2/10/06, Conclusions of Law Nos. 4–10 at 11–12; R.R. at R–285–R–286.

The Partnership moved for post-trial relief and requested a new trial, judgment notwithstanding the verdict or other post-trial relief. The Partnership alleged that the trial court abused its discretion or committed an error of law by:

1. Failing to find that the cost of the service to Plaintiff's [Partnership] structure bore no rational relationship to the value of the services provided as determined by comparing the difference between Plaintiff's [Partnership] cost based on actual water usage versus Plaintiff's [Partnership] cost based on Defendant's [Authority] flat rate assessment.

. . . .

3. Failing to find that the classifications adopted by the Defendant [Authority] were arbitrary and capricious and discriminatorily applied to Plaintiff [Partnership].

Post-trial Motion, February 21, 2006, Paragraphs 1 and 3 at 1–2; R.R. at R–288–R–289.[6]

The trial court denied the post-trial motion. With respect to the allegation that the trial court's failure to find that the cost of the Authority's service did not bear a rational relationship to the value of the services provided, the trial court determined:

[T]he burden was on Plaintiff [the Partnership] to establish that Defendant's [Authority] rate structure was unreasonable in relation to the water actually consumed or readily available for use. Plaintiff [the Partnership] produced no evidence at trial to establish that said rate structure was not reasonably related to the value of services provided by the Defendant [Authority].... Defendant [Authority] properly charged Plaintiff [the Partnership] for 27 EDUs based on either a Residential or Commercial Customer classification according to its June 10, 1998 Rate Resolution and January 15, 1998 Rules and Regulations.

Trial Court Opinion, May 11, 2006 at 3–4; R.R. at R–294–R–295.

Regarding the assertion that the trial court erred when it failed to find that the Authority's rate structure was arbitrary and capricious and indiscriminately applied, the trial court determined that the classification and rate structure passed muster because it was based on the June 10, 1998, Rate Resolution and the January 15, 1998, Rules and Regulations. The trial court also found the Authority applied the definitions and calculations uniformly. The trial court further reasoned that the Partnership failed to produce any evidence that the Authority's classifications and rates discriminated against the elderly or the indigent or that similar ratepayers were assessed differently.

---

**6.** The Partnership also alleged that the trial court erred when it did not permit the Partnership to introduce evidence to establish, and did not then find based on the evidence, that the Partnership was a 'governmental' structure and entitled to service based on actual water usage and not based on the flat rate. The Partnership further alleged that the trial court erred when it failed to find that the Authority had applied a per gallon rate structure to other users such as Chicora Medical Center while the Partnership was required to pay a flat rate. The trial court determined that the Partnership did not raise these issues at trial and, consequently, the issues were waived. These issues are not before this Court.

Initially, the Partnership contends that the trial court erred when it relied solely on the uniform application of the rate structure and failed to compare the charges assessed with the volume, a standard established by the Authority in order to determine if the rate bore a reasonable relationship to the value of the services actually consumed.[7]

The Partnership asserts that it was charged for twenty-seven EDUs annually but only consumed between four and ten EDUs worth of water (based on 54,000 gallons of water per EDU per year). The Partnership argues that the Authority failed to establish how its flat rate system bore a reasonable relationship to the services actually consumed because it paid for services at a rate at least three times greater than the amount actually consumed. The Partnership wishes to put "its shoe on the Authority's foot." The burden was the Partnership's.

The trial court did address this issue in both its initial opinion and in its opinion with respect to the post-trial motion. The trial court determined:

> Municipalities may create classifications of users as long as 'the charge is uniform within the classification and is reasonably proportional to the service rendered.' ... Sewer charges must be reasonably related to the value of the service rendered as actually consumed **or as readily available for use**.... If the user classification is reasonable and uniform, flat rate sewer rental, which reasonably relates to the value of the service provided, may be applied.... This Court found that application of the Defendant's [Authority] rate structure was reasonably related to the value of the services rendered as actually consumed or readily available for use because all of the apartment units are treated uniformly and each one is billed as an equivalent dwelling unit.... The Court then found that Defendant's [Authority] flat rate charge was appropriate....
>
> Plaintiff [the Partnership] argues that when it introduced evidence of its consumption of much less water than that for which the Defendant [Authority] was billed, the burden shifted to the Defendant [Authority] to establish the value of the services readily available. The plaintiff [the Partnership] bears the burden to establish that the sewage authority abused its discretion in the establishment of its rate structure.... The burden does not shift; it remains on the Plaintiff [the Partnership]. As such, the burden was on Plaintiff [the Partnership] to establish that Defendant's [Authority] rate structure was not reasonably related to the value of services provided by the Defendant [Authority]. As discussed in this Court's February 10, 2006 Memorandum Opinion, Defendant [Authority] properly charged Plaintiff [the Partnership] for 27 EDUs based on either a Residential or Commercial Customer classification according to its June 10, 1998 Rate Resolution and January 15, 1998 Rules and Regulations. (Citations omitted). (Emphasis in original).

Trial Court Opinion, May 11, 2006, at 3–4; R–294–R–295.

In *Patton–Ferguson Joint Authority v. Hawbaker*, 14 Pa.Cmwlth. 402, 322 A.2d 783 (1974), this Court addressed a similar situation. J. Alvin Hawbaker (Hawbaker) owned apartments serviced by the Patton–

---

**7.** This Court's review of the trial court's decision denying post-trial motions is limited to a determination of whether there was an abuse of discretion or an error of law. *Commonwealth by Corbett v. Manson,* 903 A.2d 69 (Pa.Cmwlth.2006).

Ferguson Joint Authority (Joint Authority). The Joint Authority filed a municipal lien against Hawbaker and caused a writ of scire facias to issue after Hawbaker failed to pay for sewer service from the third quarter of 1969 to the fourth quarter of 1971 inclusive. Hawbaker filed an affidavit of defense which challenged the rate resolution of the Joint Authority. Under the Joint Authority's rate schedule, residential customers were billed $135.40 per year per each dwelling unit with each residential dwelling unit in an apartment building billed as a separate entity. Hotels and motels were not classified residential, rather each hotel or motel room was considered one-half of an equivalent dwelling unit. The Court of Common Pleas of Centre County agreed with Hawbaker that the flat rate charge of $33.85 per quarter, when applied to one, two, or three bedroom apartments as well as to separate dwelling units, was an arbitrary and unreasonable charge for the service rendered to Hawbaker and ordered that the liens be removed. *Hawbaker*, 322 A.2d at 784–785.

The Joint Authority appealed to this Court which reversed:

> Moreover, the evidence presented by the appellee [Hawbaker] does not indicate that the Authority's [Joint Authority] rate classification was improper in regard to the value of service rendered. The appellee [Hawbaker] did contend that a random sampling survey had shown single family dwellings as using more water, and so requiring more sewage service than apartment dwellings. The persuasiveness of this study, however, is greatly lessened, if not entirely lost, because of its special selectivity, the small number of homes chosen for survey, and the short span of time covered. In his attack on the reasonableness of the rate in relation to the service rendered, the appellee [Hawbaker] further

emphasizes *the amount of use of the service rather than its value*. Sewer rental charges, however, must have a reasonable relationship to the *value* of the service rendered either as actually consumed or as readily available for use, and there is evidence here to show that the availability of service for apartments and single family dwellings, based on peak requirements, was substantially the same.

> . . . .

> Where the classification of users has not been proved to be unreasonable and is clearly uniform, flat rate sewer rental which reasonably relates to the value of the service rendered may be applied. . . . When, as here, the appellee [Hawbaker] has not satisfactorily proved that such standard was not met, we must find that the rate imposed by the Authority [Joint Authority] conforms with the legislative direction. (Citations omitted). (Emphasis in original and added.)

*Hawbaker*, 322 A.2d at 786–787.

Here, this Court must agree with the trial court that the Partnership failed to produce evidence which showed that the rates charged did not bear a reasonable relationship to the value of the services consumed. Although the Hawbaker survey, in *Hawbaker*, was found insufficient to meet his burden of proof, Hawbaker presented evidence to support its position. The Partnership failed to present any evidence to prove that it was treated any differently than any other single meter, multi-family dwelling. Establishing that the Authority charged the Partnership at a rate that was unreasonably related to the value of the services *actually consumed* necessarily involved an examination of the Partnership's charges compared to that of other apartment owners. The Partnership did not provide any evidence of the consumption of any individual unit in the sys-

tem and no evidence of an individual unit's consumption with respect to other residential users. In *Hawbaker*, this Court determined that Hawbaker's survey was lacking because of the small number of homes chosen for the survey and the small amount of time the survey covered. "[T]he fact that one property may use substantially more water than another similarly classified is not in itself ground for compelling a reduction of the rental to those properties which have fewer users or which use the water more economically." *Hickory Township v. Brockway*, 201 Pa.Super. 260, 192 A.2d 231, 234 (1963). The trial court appropriately found that the Partnership failed to introduce any evidence to establish that the charge did not bear a rational relationship to the value of the services rendered.

In a nutshell, the Partnership's argument is flawed. It argues that it was overcharged for sewage service because it was charged for twenty-seven EDUs per year when it only consumed between four and ten EDUs worth. The Partnership ignores that the Authority set forth in the June 10, 1998, Rate Resolution that an EDU with respect to a residential customer was defined as any room, group or rooms or enclosure, occupied or intended for occupancy as separate living quarters for a family or other group of persons living together or by persons living alone. Each apartment unit meets the definition of an EDU. It is highly unlikely, if not impossible, that all of the residential units that would be assigned one EDU would consume an equivalent amount of water. For instance, a person living alone would not consume as much as a family of six. However, once again, the key is not the amount of the service used but rather the value of the service. *Hawbaker*.

Also, the Partnership's analysis based on 54,000 gallons of water use per year is flawed as well. For commercial and industrial customers, an EDU was defined as each 54,000 gallons of water used or less per year. The Partnership took the total amount of water use per year and divided that number by 54,000 to get the number of EDUs it used per year. When it performed this calculation, it concluded that the apartment dwellers only used between four and ten EDU's worth of water. While it argues that it should be classified as a single commercial user like a motel and just be charged on this basis, it ignores the classification of apartments as residential. While it would be advantageous to the Partnership to be classified as a commercial customer, the Authority which has the authority to fix rates saw fit to classify apartments as residential. Absent a lack of uniformity within the classification and proof that the classification was not reasonably proportional to the service rendered, *Hawbaker*, the trial court had no choice but to find as it did.

The Partnership also contends that there was no need for twenty-seven EDUs of sewage service to be readily available to the Partnership apartment building. The Partnership asserts that based on Graham's testimony the Authority used 2.8 persons per household to establish its calculations, but the record established that twenty-six of the twenty-seven units at the Partnership were occupied by only one person. Graham also testified that there were approximately seven hundred EDUs connected to the Authority's facilities with an average treatment flow of approximately 200 gallons per EDU per day. The Partnership then asserts that its total water usage for 2004 of 506,000 gallons divided by 365 days per year, divided by twenty-seven units yields a water usage per EDU per day of 51.34 gallons. The Partnership then asserts that this amount is about one-quarter of the average. The Partnership further argues that Graham

testified that the Authority designed a facility that would treat 1,520 EDUs per day but has only 700 EDUs, less than one-half the design capacity. As a result, the Partnership asserts that it paid a disproportionate share based on its actual water usage, the design needed to make the service readily available, the average EDU being treated by the Authority, and the design capacity of the system.

Once again, the trial court determined that "the application of this rate structure is not arbitrary or unreasonably related to the value of services rendered either as actually consumed, or readily available for use. All apartment units are treated uniformly and each is billed as one equivalent dwelling unit. Flat rate structures are permitted under Pennsylvania law." Opinion, 2/10/06 at 10; R.R. at R–284.

First, while the system may well be designed for 1,520 EDUs and now only has 700 EDUs, there is nothing which requires an authority to establish a sewage system to construct a facility with a capacity limited to treating the number of EDUs existing at or near the time of the system's completion. Indeed, it would be shortsighted for an Authority to design a system which could not handle growth in its service area. The mere assertion that the Authority's system was designed to handle more than twice the number of EDUs it currently served and only expanded by thirty EDUs in seven years (as the Partnership charges) does not mean that the Partnership paid a disproportionate share of the service readily available to it.

Second, Graham and Callihan both stated that the Authority was required to withhold approximately $205,000 for its debt service reserve. Graham also testified that the Authority was required to create and maintain a fund for operation and maintenance. The maintenance fund had a balance of approximately $76,600.00. N.T. at 162–163; R.R. at R–181–R–182. The system runs on a 700 EDU billing unit. In order to pay the annual debt service, the Authority would have to assess each EDU $24 per month. N.T. at 168; R.R. at R–187. This Court cannot agree with the Partnership that the charge does not bear a reasonable relationship to the service readily available to it. Further, approximately 500 of the Authority's 700 EDUs are residential customers. Once again, the Partnership failed to prove how it was treated differently. Undoubtedly, there are residential customers who also use less water than average, just as certainly as some use more.[8] The line must be drawn somewhere, and the Partnership failed to establish that the Authority abused its discretion when it "drew the line" and established the classification system.

Accordingly, this Court affirms.

### ORDER

AND NOW, this 27th day of April, 2007, the order of the Court of Common Pleas of Butler County in the above-captioned matter is affirmed.

---

8. The Partnership also contends that the Authority has a substantial net income due to the overpayments the Partnership has made. Graham testified that while the Authority's balance sheet from January 1, 2005, through November 30, 2005, showed a profit of $77,000; however, Graham also testified that there was a $92,000 payment due on December 3, 2005. N.T. at 164; R.R. at R–183.