**Richard J. PAYNE and Catherine A. Payne**

v.

**SPRING–BENNER–WALKER JOINT AUTHORITY, Appellant.**

Commonwealth Court of Pennsylvania.

Argued June 6, 2011.
Decided June 30, 2011.

Robert A. Mix, Bellefonte, for appellant.

David D. Engle, State College, for appellees.

BEFORE: McGINLEY, Judge, and BUTLER, Judge (P), and FRIEDMAN, Senior Judge.

OPINION BY SENIOR Judge FRIEDMAN.

Spring–Benner–Walker Joint Authority (Authority) appeals from the October 4, 2010, order of the Court of Common Pleas of Centre County (trial court), which denied the Authority's post-trial motions and affirmed its prior judgment that the Authority did not reasonably require Richard J. Payne and Catherine A. Payne (Developers) to plug and permanently seal floor drains they built in the Lingwood Townhomes (Lingwood) complex. We reverse.

In 1998, Developers purchased land for the construction of Lingwood, which consists of twenty-six units in five separate buildings. They obtained a construction loan and various permits, including a sewer permit from the Authority. The sewer permit did not address the use or non-use of floor drains or condensate drains connected to the sewer system.[1] (Findings of Fact, Nos. 1–5.)

---

1. At the time, the Centre County building code required a floor drain, by the water

After construction of the sewer infrastructure for the first twelve units of Lingwood, the Authority inspected the property. For each unit, a floor drain and a condensate drain connected directly to the sewer system. The Authority's executive director, Robert Decker, who performed the inspection with two other Authority employees, informed Developers that the buildings passed the inspection. Between the time of the inspection and the completion of the units, no one at the Authority ever advised Developers that they could not connect floor drains or condensate drains directly to the sewer system. (Findings of Fact, Nos. 7–8, 11–13.)

In 1999, Developers constructed the remaining fourteen units of Lingwood in the same manner. The Authority inspected the sewer infrastructure, and Developers' connection of the floor drains and condensate drains directly to the sewer system passed the inspection. (Findings of Fact, No. 16.)

In 2006, the Authority enacted Resolution 2006–1 in order to prohibit the inflow of rain, surface water, ground water, run-off water or other water into the sewer system.[2] The resolution: (1) requires an inspection of all properties connected to the sewer system upon a change of ownership;[3] (2) imposes an inspection fee of $50.00 if the Authority finds an illegal connection; and (3) allows the Authority to issue a notice of violation requiring an owner to disconnect a device that contributes unlawful and unauthorized inflow to the sewer. (Findings of Fact, Nos. 19–22.) Section 4.17 of the Authority's rules and regulations prohibits floor drains, except at the Authority's discretion.[4] The provision does not prohibit condensate drains.[5] (Findings of Fact, Nos. 24–25.)

Subsequently, Developers attempted to convey a Lingwood unit to a third party without disconnecting the unit's floor drain and condensate drain from the Authority's sewer system. Developers requested that the Authority exercise its discretion under section 4.17 and grant an exception to Resolution 2006–1 because the Authority

heater, connected to the sewer. (N.T., 5/18/10, at 24, R.R. at 59a.) Floor drains are helpful where: (1) a water heater must be drained; (2) a clothes washer overflows; (3) a lower level is flooded with sewage from a sewer backup; and (4) a commode overflows. (*Id.* at 25–26, 30–31, R.R. at 60a–61a, 65a–66a.) By connecting a floor drain to the sewer, a builder prevents gray water or sewage from entering ground water. (*Id.* at 30, R.R. at 65a.) A condensate drain removes the moisture produced by an air conditioner. (*Id.* at 14, R.R. at 49a.)

**2.** N. Warren Miller, the executive director of the Authority, testified that: (1) all sewage is processed by the Bellefonte Borough treatment plant; (2) in 2004 or 2005, the Authority came very close to its maximum daily limit; (3) the Authority used a video inspection camera to check its entire system to see whether water might be leaking into the system and found no sign of water leaks; (4) the Authority decided it was necessary to reduce the amount of water entering the sewer system from illegal connections. (N.T., 5/18/10, at 102–03, R.R. at 137a–38a.)

**3.** Actually, Resolution 2006–1 allows the Authority to do a home inspection at any time; however, the Authority makes the inspections only upon a change of ownership because it does not have enough people to inspect every home within a short period of time. (N.T., 5/18/10, at 104–05, R.R. at 139a–40a.)

**4.** Miller has exercised his discretion six times under section 4.17 to allow floor drains. Miller testified that he has allowed floor drains for certain types of commercial establishments, but he has not allowed floor drains for residences. (Findings of Fact, No. 36; N.T., 5/18/10, at 114–15, R.R. at 149a–50a.)

**5.** Miller that the Authority does not allow condensate drains to connect to the sewer because the water is drinkable and there is no reason to treat it. (N.T., 5/18/10, at 112, R.R. at 147a.)

had inspected and approved the drains in 1998. (Findings of Fact, Nos. 26–27.)

Ultimately, the Authority stated that, before conveying any Lingwood unit, Developers would be required to permanently plug any floor and condensate drains by placing a compression fitting into the drain and sealing it with hydraulic cement. Developers objected because the Authority had no proof that any spring water, ground water or surface water has entered the sewer system through the floor drains at Lingwood. Moreover, if the Authority had prohibited the drains at the time of the inspection in 1998, Developers could have remedied the problem at a cost of $100.00 per unit. Developers projected that the current cost of permanently plugging and sealing the drains would be $3,000.00 per unit.[6] (Findings of Fact, Nos. 28, 30–31, 37.)

■ Developers brought suit against the Authority under section 5607(d)(9) of the Municipality Authorities Act (Act), which states in relevant part:

Any person questioning the reasonableness or uniformity of a rate fixed by an authority or the adequacy, safety and reasonableness of the authority's services ... may bring suit against the

authority in the court of common pleas of the county where the project is located....

53 Pa.C.S. § 5607(d)(9). The trial court entered judgment in favor of Developers, applying the doctrines of vested rights, variance by estoppel and equitable estoppel to the case.[7] The trial court found that: (1) Developers reasonably relied upon the Authority's approvals of the drains in the Lingwood units to spend $1,650,000.00 to complete the Lingwood units; and (2) the Authority did not enforce section 4.17, prohibiting floor drains, until November 2008. The trial court also concluded that the Authority's inspection fee of $50.00 is not uniform because it is applied only to properties with floor drains that have changed ownership. The Authority filed post-trial motions, which were denied. The Authority now appeals to this court.[8]

■ The Authority argues that the trial court erred in applying the doctrines of vested rights, variance by estoppel and equitable estoppel rather than the abuse of discretion standard. We agree.

■ The question raised by Developers' suit under section 5607(d)(9) of the Act

6. We note that Miller testified that the Authority would seal a floor drain for $25.00. (N.T., 5/18/10, at 108, R.R. at 143a.) Developers, however, would do more, viz., disconnect the floor drain from the sewer and build an alternative floor drain system. (Id. at 48–50, R.R. at 83a–85a.)

7. In In re Kreider, 808 A.2d 340, 343 (Pa. Cmwlth.2002) (citations omitted), this court discussed the three equitable remedies as follows:

A variance by estoppel is one of three labels assigned in Pennsylvania land use/zoning law to the equitable remedy precluding municipal enforcement of a land use regulation. Our courts have generally labeled the theory under which a municipality is es-

topped: (1) a "vested right" where the municipality has taken some affirmative action such as the issuance of a permit; [2] a "variance by estoppel" where there has been municipal inaction amounting to active acquiescence in an illegal use; or, [3] "equitable estoppel" where the municipality intentionally or negligently misrepresented its position with reason to know that the landowner would rely upon the misrepresentation.

8. This court's review of the trial court's decision to deny post-trial motions is limited to a determination of whether there was an abuse of discretion or an error of law. *Chicora Commons Limited Partnership, LLP v. Chicora Borough Sewer Authority*, 922 A.2d 986, 992 n. 7 (Pa.Cmwlth.2007).

was whether the Authority's decision to disallow the floor drains and condensate drains at Lingwood was reasonable.[9] The question was not whether Developers were entitled to equitable relief from the rules and regulations of the Authority. Thus, the equitable doctrines of vested rights, variance by estoppel and equitable estoppel were not applicable, and the trial court erred in applying them in this case.

■ The Authority next argues that Developers failed to present sufficient evidence to establish that the Authority abused its discretion. We agree.

Here, the trial court concluded that the Authority abused its discretion because the purpose of Resolution 2006–1 and section 4.17 was to prevent water from entering the sewer system, and the Authority had no proof that water was entering the sewer system through the drains at Lingwood. However, the Authority's sewer system is near capacity. The Authority checked the sewer pipes and found that water was not entering the system through any leaks. The Authority's decision to locate illegal devices that might be allowing water to enter the sewer system and to require property owners to disconnect them from the sewer system is a reasonable solution to that problem. The solution is not made unreasonable simply because the Authority does not have proof that the drains in a particular property are allowing water to enter the sewer system.

■ Finally, the Authority argues that the trial court erred in concluding that the Authority's inspection procedures and fees are not uniform because they are applied only to properties that have changed ownership. We agree.

Resolution 2006–1, which sets forth the inspection procedure and fee, applies to all property owners. Although the Authority decided to inspect homes upon a change of ownership, Resolution 2006–1 does not contain that procedure. Using a change of ownership as the occasion for an inspection was simply the way that the Authority decided to begin the inspection process, given its limited personnel and resources. Eventually, the Authority will inspect all properties. Therefore, the procedure is uniform. Moreover, the $50.00 fee is uniform with respect to that class of home owners who have connected an illegal device to the sewer system.

Accordingly, we reverse.

### ORDER

AND NOW, this 30th day of June, 2011, the order of the Court of Common Pleas of Centre County, dated October 4, 2010, is hereby reversed.

---

9. We note that the abuse of discretion standard includes consideration of whether an exercise of discretion was reasonable. *See Honaman v. Township of Lower Merion*, 13 A.3d 1014, 1025 (Pa.Cmwlth.2011) (noting that an abuse of discretion exists if a judgment is unreasonable).