## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Water Polo III, LP, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 1116 C.D. 2021 |
| | : | Submitted: August 5, 2022 |
| Susquehanna Township Authority | : | |
| and Capital Region Water Authority | : | |

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                                        FILED: December 1, 2022

Water Polo III, LP (Water Polo) appeals from the September 17, 2021 opinion and order[1] of the Court of Common Pleas of Dauphin County (the trial court), which: (a) determined the Susquehanna Township Authority (Authority) properly classified

---

[1] On November 1, 2021, Water Polo filed a motion for stay in this matter, which we granted, wherein Water Polo asserted it filed a motion for post-trial relief with the trial court on September 27, 2021. Since the trial court did not schedule a hearing on that motion until January 2022, Water Polo further asserted it filed its notice of appeal on October 7, 2021, to ensure compliance with the Rules of Appellate Procedure should the trial court ultimately deny its motion for post-trial relief. The trial court did deny Water Polo's motion for post-trial relief by order filed January 6, 2022, and we lifted the stay in this matter by order dated February 2, 2022. Water Polo now asserts that it is appealing from both the trial court's September 17, 2021 and January 6, 2022 orders. Since the trial court's January 6, 2022 order did not confirm or effectuate re-entry of its September 17, 2021 judgment, Water Polo's appeal properly lies only from the trial court's September 17, 2021 order. *See Vance v. 46 & 2, Inc.*, 920 A.2d 202, 205 n.2 (Pa. Super. 2007). Accordingly, we review this matter as Water Polo's timely appeal of the trial court's September 17, 2021 order.

and billed Water Polo for sewer services, (b) denied Water Polo's claims for relief, and (c) entered judgment against Water Polo. On appeal, Water Polo presents a variety of claims, including unjust enrichment and violations of its statutory and constitutional rights. Upon review, we affirm.

## I. Background

Authority is an independent municipal authority and the sole provider of sanitary sewer and stormwater services in Susquehanna Township, Dauphin County, Pennsylvania (Township). Trial Ct. Op., 9/20/21, at 1. Authority does not have its own sewer treatment facilities. *Id.* Instead, Authority maintains a collection and transmission system in Township and contracts with Capital Region Water Authority (CRW) for wholesale sewage treatment. *Id.* Authority charges residential customers a flat rate and commercial customers a usage rate, which is based off of metered water consumption. *Id.*

Authority's regulations[2] define a "Commercial Establishment" as

> any room, group of rooms, building or enclosure used or intended for use in the operation of one business enterprise for the sale and distribution of any product, commodity, article or service or used or intended for use for any social, amusement, religious, educational, charitable or public purpose and containing plumbing. 'Commercial Establishment:['] includes, but is not limited to, institutional dormitories, hotels and motels, and permanent care facilities licensed by the State (e.g. personal care facilities.).

Reproduced Record (R.R.) at 601a. Authority's regulations define a "Hotel" or "Motel" as

> a building or other enclosure having two (2) or more separate living units, with each unit usually consisting only of a furnished bathroom

---

[2] Authority's regulations were admitted without objection at the trial court's hearing in this matter. Reproduced Record (R.R.) at 30a, 151a.

and bedroom, including linens and television, generally having daily maid service, generally having a daily and weekly rate schedule, and generally occupied temporarily by persons having another more permanent place of residence.

*Id.* at 602a. Authority's regulations define a "Residential Unit" as

any room, group of rooms, building or other enclosure occupied or intended for occupancy as separate and individual living quarters by a family or other group of persons living together, or by a Person living alone, but excluding institutional dormitories, hotels, motels or commercial establishments, as defined, but to include, but not limited to, apartments and form[s] of multi-family dwellings not otherwise defined, and retirement facilities, or such some similar facility or facilities, including but not limited to personal care boarding homes licensed by the Commonwealth.

*Id.* at 603a. Authority's regulations further specify "[d]welling units . . . shall be considered as separate units regardless of whether each has or requires a separate or common connection." *Id.* at 621a.

Authority, by Resolution No. 2020-01,[3] established that its current "sewer rental rate for all residential users of the system, regardless of location within the Township, shall be $123.00 per quarter . . . ." R.R. at 647a-48a. For commercial users, "[t]he minimum sewer rental . . . shall be in the amount of $130.00 per quarter for the first 16,000 gallons of use and $8.13 per 1,000 gallons used for all commercial users of the system in excess of 16,000, regardless of location within the Township . . . ." *Id.* at 648a.

Water Polo is the owner of an apartment complex in Township known as the Reserve at Paxton Creek (Property). Trial Ct. Op., 9/20/21, at 1. Property has 160 apartment units and a clubhouse which are connected to Authority's sanitary sewer

---

[3] On Water Polo's motion, which was not opposed by Authority, the trial court admitted Resolution No. 2020-01. R.R. at 27a, 151a.

3

system. *Id.* Water Polo's water provider sends Water Polo one bill, which is based upon consumption data from a single water meter. *Id.* Authority, however, charges Water Polo separately for 161 residential units. *Id.*

Water Polo filed a complaint with the trial court to challenge Authority's rate structure. The trial court conducted a non-jury trial on July 9, 2021. Water Polo presented the testimony of its apartment manager and the testimony and report of its expert, a Professional Civil Engineer. R.R. at 74a. Water Polo's apartment manager testified regarding the amenities offered at Property. *Id.* at 55a-57a. She also contacted a hotel which was less than a mile from Property and determined its amenities were similar to the amenities at Property. *Id.* at 65a-68a. Despite the similarities, Water Polo's apartment manager admitted Water Polo's minimum rental period at Property was one year, and Water Polo did not serve "transient automobile travelers" or short-term renters. *Id.* at 72a-73a. Water Polo did not present any evidence to establish average or estimated sewer flows for hotels. Nonetheless, Water Polo's apartment manager stated that Property was "the same or similar" to a hotel. *Id.* at 68a.

Water Polo's expert explained that Authority submitted a variety of sewer planning documents to the Pennsylvania Department of Environmental Protection (DEP) in which Authority used an approved sewage flow rate of 88.75 gallons per day for Water Polo's units. *Id.* at 229a. This is far below what Authority's regulations define as an Equivalent Dwelling Unit (EDU), which is "synonymous with" a residential establishment and is "assumed to be 180 gallons per day." *Id.* Water Polo's expert also conducted an analysis of Water Polo's sewer charges over the prior seven quarters. R.R. at 236a. In that time, Authority charged Water Polo a total of $138,621.00 for sewer services. *Id.* If Authority charged Water Polo on a

4

water consumption basis (as a commercial customer), however, Authority would have only charged Water Polo $64,153.70. *Id.*

Water Polo's expert then opined: (a) apartment units use significantly less water than other residential units (single-family residences and townhomes), (b) apartment units are more like some of the excepted users (institutional dormitories, extended stay motels, and permanent care facilities) than other residential units, (c) the Authority has the ability to charge Water Polo on a metered water consumption basis like commercial users, (d) charging apartments on a metered water consumption basis would encourage conservation and identification of leaks, and (e) apartment complexes financially subsidize other customers under Authority's flat fee billing structure. R.R. at 237a.

Authority presented the testimony of its consulting engineer and Township's manager (Township manager). Township manager explained there are no restrictions on how much sewage a user can discharge into the system and Authority does not reserve system capacity for users. R.R. at 174a, 32a. The flow rates approved by DEP were, therefore, only used for sewer planning purposes. *Id.* at 32a, 35a. Similarly, Authority's consulting engineer explained that the sanitary system is a "ready-for-service" system, as "when you flush, it goes." R.R. at 196a. Authority's consulting engineer agreed there is no limit to how much sewage the system will accept from any user, and all sewage flow estimates presented to DEP were for sewage planning purposes only. *Id.* at 192a-97a.

Township manager explained there are 2,569 apartment units in Township, and Authority charges each of those units as a residential customer, without exception. R.R. at 172a. He further explained that it takes one Township employee approximately two weeks to convert and enter water usage data each quarter for

5

Authority's roughly 500 commercial accounts. *Id.* at 175a. If Authority began charging apartment users on a consumption basis, it would add significant time and expense to Authority's billing process. *Id.*

Authority's consulting engineer opined that billing based upon water usage is "not the best way." *Id.* at 198a. One reason for this is that Authority provides sewer services to some users for whom water usage data is not available, as they have their own water wells. A second reason is that Authority must manage and account for surface and subsurface water that enters the system. *Id.* at 199a. This water would be unaccounted for if all bills were based on water consumption. *Id.* Conversely, not all water which customers use ends up in the sanitary sewer system. *Id.*

Authority's consulting engineer explained that Authority begins its annual rate setting process by projecting its costs for the upcoming year. R.R. at 164a. Authority's costs fall into three general categories: (1) maintenance, which includes system maintenance and treatment costs paid to CRW, (2) administration, which includes staffing costs and engineering services, and (3) bonds, which includes repayment for financing of long-term improvement projects for the sewage system. *Id.* 164a-68a. After projecting its costs, Authority projects its revenue for the upcoming year by multiplying the number of residential users by the flat rate fee and estimating consumption for commercial users. *Id.* at 168a, 201a-02a. Finally, Authority determines what rates would make Authority's revenue projections meet or exceed its expense projections for the upcoming year and enacts a rate resolution with those rates. *Id.*

## II. Trial Court's Factual Findings and Conclusions of Law

The trial court found Authority sets its rates based upon two classifications: residential units and commercial units. Trial Ct. Op., 9/20/21, at 3. The trial court

6

also found Authority's regulations define apartments as residential units rather than commercial units, and Authority charges residential customers a flat fee and commercial customers based upon water consumption. *Id.* at 4. The trial court found Authority's sewer rates are based upon the annual expenses of maintaining the sewage system, not the number of gallons of sewer waste generated by each user. *Id.* The trial court also found all of Water Polo's units "obtain a benefit" from being hooked up to Authority's sewage system. *Id.* at 5. As a result, the trial court found "it is reasonable for all residential units, including the ones contained in [Water Polo's] Property, to pay a quarterly fee towards the costs associated with maintaining the system." *Id.*

The trial court concluded Authority's rate structure was reasonable and permitted under the Municipality Authorities Act[4] (MAA). Trial Ct. Op., 9/20/21, at 6. Accordingly, the trial court denied Water Polo's claims for relief and entered judgment in favor of Authority. Water Polo filed a motion for post-trial relief, which the trial court denied. Water Polo's timely appeal followed.

### III. Analysis

On appeal, Water Polo argues the trial court erred by not concluding: (a) Authority's rate structure violated the MAA, (b) Authority's regulations violated Water Polo's equal protection rights, (c) Water Polo unjustly enriched Authority, (d) Authority's consent order agreement with DEP created a different rate classification for apartments, (e) Authority's regulations violated Water Polo's procedural due process rights, and (f) Authority improperly taxed Water Polo.[5]

---

[4] Municipality Authorities Act, 53 Pa.C.S. §§ 5601-5623.

[5] For purposes of clarity, we have reordered and reframed Water Polo's issues raised on appeal.

7

"This Court's scope of review of a judgment following a non-jury trial is to determine whether the findings of the trial court are supported by competent evidence, and whether the court committed error in the application of law." *Com. v. Hoffman*, 938 A.2d 1157, 1160 n.10 (Pa. Cmwlth. 2007) (citation omitted). "[T]his Court may not reweigh the evidence and substitute our judgment for that of the fact-finder." *Id.* "Furthermore, the fact-finder is free to believe all, part or none of the evidence presented." *Id.*

### A. Municipality Authorities Act

Since Water Polo's claims are all, in a broad sense, attacks on Authority's rate structure, we begin our analysis by addressing whether Authority's rate structure violates the MAA. The MAA authorizes municipal authorities:

> To fix, alter, charge and collect rates and other charges in the area served by its facilities **at reasonable and uniform rates** to be determined exclusively by it for the purpose of providing for the payment of the expenses of the authority, the construction, improvement, repair, maintenance and operation of its facilities and properties . . . .

53 Pa.C.S. § 5607(d)(9) (emphasis added). "The MAA provides municipal authorities with significant discretion to impose fees and charges." *J. Buchanan Assoc., LLC v. Univ. Area Joint Auth.*, 231 A.3d 1089, 1104 (Pa. Cmwlth. 2020) (citation omitted). A municipal authority's rates must, however, be "reasonably proportional to the value of the service rendered." *W. Clinton Cnty. Mun. Auth. v. Rosamilia*, 826 A.2d 52, 57 (Pa. Cmwlth. 2003).

> In deciding whether a rate is reasonable, the trial court's scope of review is limited to determining whether there has been a manifest and flagrant abuse of discretion or an arbitrary establishment of the rate system. The party challenging the validity of the rate has the burden of proving that it is unreasonable. Whether a rate is reasonable is dependent upon whether it is reasonably proportional to the value of the

8

service rendered. 'That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion.'

*Allegheny Ludlum Corp. v. Mun. Auth. of Westmoreland Cnty.*, 659 A.2d 20, 26 (Pa. Cmwlth. 2005) (citations omitted). "[S]ewage rates need not be proportioned with exactness to the use made or the cost to the individual customer, so long as [they are] reasonably related to the cost of maintaining the service for all the customers, and the customers challenging the rates receive 'some' benefit from the system." *Ack v. Carrol Twp. Auth.*, 661 A.2d 514, 518 (Pa. Cmwlth. 1995) (citation omitted).

Our Court has previously upheld rate structures that are similar to Authority's rate structure. *See Chicora Commons Ltd. P'ship, LLP v. Chicora Borough Sewer Auth.*, 922 A.2d 986 (Pa. Cmwlth. 2007). In *Chicora*, Chicora Borough Sewer Authority's (CBSA) rates were based upon three classifications: residential, commercial, and industrial. *Id.* at 987. Chicora Commons Limited Partnership, LLP (Chicora Commons), which owned a 27-unit apartment complex, paid for water based upon consumption data from a single water meter. *Id.* at 987-88. CBSA, however, charged Chicora Commons for sewer services at a residential flat rate for each of its 27 apartment units. *Id.* CBSA charged commercial and industrial customers on a water consumption basis. *Id.* Chicora Commons challenged CBSA's rates by presenting arguments that are similar to those presented by Water Polo in this matter. *See id.* at 988-89. Of particular similarity, Chicora Commons asserted CBSA's flat rate system did not bear "a reasonable relationship to the services actually consumed because it paid for services at a rate at least three times greater than the amount actually consumed." *Id.* at 992. In denying Chicora Commons' claims, our Court noted CBSA's rate structure was "'not arbitrary or unreasonably related to the value of services rendered either as actually consumed, or readily

9

available for use. All apartments are treated uniformly[,] and each is billed as one equivalent dwelling unit. Flat rate structures are permitted under Pennsylvania law.'" *Id.* at 995 (citation omitted).

We discern no significant distinctions between Authority's rate structure in this matter and CBSA's rate structure in *Chicora*. The trial court's finding that Water Polo obtains a benefit from Authority's sewage system was supported by competent evidence in this matter. The trial court's finding that Authority's rates are tied to the annual expenses of maintaining the sewage system was also supported by competent evidence. Thus, like in *Chicora*, Authority's rate structure is "not arbitrary or unreasonably related to the value of services rendered either as actually consumed, or readily available for use." *See Chicora*, 922 A.2d at 995. Accordingly, we conclude the trial court did not commit an error of law when it determined Authority's rate structure does not violate the MAA.

## B. Equal Protection

Water Polo's second argument on appeal is Authority's rate classifications violate its equal protection rights, as Authority arbitrarily treats Water Polo's rental units differently than similar uses. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides no State shall "deny to any person[6] within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, §1. Similarly, article 1, section 26 of the Pennsylvania Constitution provides "[n]either the Commonwealth nor any political subdivision thereof shall

---

[6] "Under the designation of 'person' there is no doubt that a private corporation is included. Such corporations are merely associations of individuals united for a special purpose, and permitted to do business under a particular name, and have a succession of members without dissolution." *Pembina Consol. Silver Mining & Milling Co. v. Com. of Pa.*, 125 U.S. 181, 189 (1888).

deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." PA. CONST. art. I, § 26.

"In its most simplistic formulation, equal protection 'demands that uniform treatment be given to similarly situated parties.'" *Lohr v. Saratoga Partners, L.P.*, 238 A.3d 1198, 1209-10 (Pa. 2020) (quoting *Zauflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1117 (Pa. 2014)). "The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, . . . provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation." *Curtis v. Kline*, 666 A.2d 265, 268 (Pa. 1995) (citations omitted). "In other words, a classification must rest upon some ground of difference which justifies the classification and has a fair and substantial relationship to the object of the legislation." *Id.* The justification required for a classification "depends 'upon which of three types a classification belongs to, what the governmental interest is in promulgating the classification, and the relationship of that interest to the classification itself.'" *Lohr*, 238 A.3d at 1210 (citation omitted). "Fundamental rights and suspect classifications trigger strict scrutiny, whereas important rights and sensitive classifications require intermediate scrutiny." *Id*. "All other legislative classifications are subject to rational basis review." *Id.*

Although sewer services relate to a person's property rights, there is no fundamental or important right to receive public sewer services. As a result, Authority's classification system is subject to a rational basis review. "[T]he rational basis test affords substantial deference to legislative policy making. The review includes two steps: 'First we must determine whether the challenged statute seeks to promote any legitimate state interest or public value. If so, we must next determine

11

whether the classification adopted in the legislation is reasonably related to accomplishing that articulated state interest or interests.'" *Lohr*, 238 A.3d at 1211 (quoting *Curtis*, 666 A.2d at 269). "Under rational basis review, the relationship between the classification and the legitimate state interest need not be set forth expressly by the Legislature." *Curtis*, 666 A.2d at 267 (citation omitted). "Moreover, courts have recognized that legislative classifications are enacted to address complex issues that may not have clear cut solutions. Accordingly, courts have opined that '[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.'" *Lohr*, 238 A.3d at 1211 (citation omitted).

We begin our rational basis review by evaluating whether Authority's regulations, specifically regarding rates, seek to promote a legitimate state interest or public value. The rates Authority charges its customers are designed each year to generate enough revenue to cover Authority's operating expenses, thereby allowing Authority to provide sewer services to Township's residents. There is certainly public value in having a sanitary sewer system. Township and Authority also have legitimate interests (sanitation, environmental, etc.) in providing sewer services to Township's residents. Therefore, we conclude Authority's regulations, specifically regarding rates, do seek to promote a legitimate state interest and public value.

We continue our rational basis review by evaluating whether Authority's rate classifications are reasonably related to Authority's provision of sanitary sewer services to Township's residents. The difference between Authority's two rate classifications (residential and commercial) is essentially based upon whether a person or persons occupy the premises as a residence or use the premises as part of a commercial enterprise. Water Polo has not alleged the two classifications lack a

difference that justifies differential treatment. Instead, Water Polo asserts it should be treated as a commercial user because apartment units are more like some commercial uses (hotels) than other residential uses (single-family homes and townhomes). Thus, Water Polo is not challenging the classification system itself, but the line between the two classifications.

As our Supreme Court outlined in *Lohr*, however, "'[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.'" *Lohr*, 238 A.3d at 1211 (citation omitted). We agree with the trial court that apartments, like homes and townhomes, are places one considers as their permanent residence, whereas hotels and motels are not. The trial court did not commit an error of law when it concluded that Water Polo did not present evidence to show this distinction was unreasonable or arbitrary. Although Water Polo presented evidence regarding its water consumption, Water Polo did not present any evidence regarding water consumption for the uses it alleges are similar to its use (hotels and motels). The presence of similar amenities (which is also true for apartments, townhomes, and some single-family residences) is not the same as similar sewer usage. As a result, Water Polo did not establish that it is similar, in terms of sewer usage, to a hotel or motel. Thus, despite some perceived inequality and a lack of mathematical nicety, Authority's classifications do not fail rational basis review, and the trial court did not commit an error of law in determining Authority's rate classifications do not violate Water Polo's equal protection rights.

### C. Unjust Enrichment

Water Polo's third argument on appeal is that its payments for sewer services unjustly enriched Authority. Water Polo asserts Authority charges it for an amount that exceeds (a) its certified amount of water usage, and (b) the actual capacity

13

available to, and approved for, Property. To prove unjust enrichment, Water Polo must establish: (1) it conferred benefits on Authority, (2) Authority appreciated those benefits, and (3) Authority accepted and retained those benefits "'under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" *Filippi v. City of Erie*, 968 A.2d 239, 242 (Pa. Cmwlth. 2009) (citation omitted). "In determining if the doctrine [of unjust enrichment] applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Id.*

The trial court determined Water Polo did not prove its unjust enrichment claim, as Water Polo failed to show Authority accepted and retained its sewer payments under inequitable circumstances. As outlined above, Authority's classification of Water Polo's apartment units as separate residential units is reasonable and permitted under the MAA. Water Polo's water consumption and the sewage flow estimates Authority provided to DEP in sewer planning are not relevant to how Authority classifies Water Polo for sewer rates. In addition, the trial court did not accept Water Polo's assertion that Authority limited its sewer capacity. As a result, we conclude the trial court's findings are supported by competent evidence, and the trial court did not commit legal error in determining Water Polo failed to prove its unjust enrichment claim.

### D. DEP Consent Order Agreement

Water Polo's fourth argument on appeal is that the trial court failed to address whether a consent order agreement between DEP and Authority mandates that Authority treat apartment complexes separately and distinctly from residential customers. The MAA specifically authorizes municipal authorities to set rates for their services. *See* 53 Pa.C.S. § 5607(d)(9). Water Polo did not provide any

14

authority, nor are we aware any exists, to support its assertion that DEP could require a municipal authority to set rates in a specific way. Additionally, upon review of the record in this matter, we do not identify any voluntary agreement by Authority to modify its rate structure and treat apartment complexes separately and distinctly from residential customers for purposes of sewer rates. Despite Water Polo's attempts to show Authority was required to have additional rate classifications, the trial court found Authority's rates were based upon two classifications and Authority's rate structure was reasonable. Since we conclude these findings were based upon competent evidence, Water Polo's argument lacks merit.

### E. Procedural Due Process

Water Polo's fifth argument on appeal is that Authority violated its procedural due process rights by not having an administrative process in place for Water Polo to challenge its sewer rates. "The fundamental components of procedural due process are notice and opportunity to be heard." *In re McGlynn*, 974 A.2d 525, 531 (Pa. Cmwlth. 2009) (citation omitted). Procedural due process is a flexible concept that "imposes only such procedural safeguards as the situation warrants." *Id.*

> The seminal case addressing due process is *Mathews v. Eldridge*, 424 U.S. 319 . . . (1976). Factually, *Mathews* concerned the Social Security Administration's decision to discontinue cash benefits without affording the recipient a pre-decisional hearing. The United States Supreme Court rejected the recipient's claim that due process required the agency to hold a hearing prior to terminating benefits. In doing so, the Court considered what process is due an individual before a property interest may be affected by government action. It identified three factors that must be considered in formulating the process due: the private interest affected by the government action; the risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the administrative burdens that additional or substitute procedural requirements would entail.

15

*Id.* at 532 (citation and footnote omitted).

Authority admits it does not have an administrative procedure for a customer to challenge its rate classification. The Authority, however, notes that the MAA provides:

> "[a]ny person questioning the reasonableness or uniformity of a rate fixed by an authority or the adequacy, safety and reasonableness of the authority's services, including extensions thereof, may bring suit against the authority in the court of common pleas of the county where the project is located or, if the project is located in more than one county, in the court of common pleas of the county where the principal office of the project is located.

53 Pa.C.S. § 5607(d)(9). Since Water Polo has a statutorily guaranteed procedure for challenging Authority's rates in the court of common pleas, Authority asserts Water Polo has adequate procedural due process.

We agree the MAA provides adequate procedural due process for Water Polo to challenge Authority's rates. The MAA permits users to file suit in the court of common pleas after a rate is "fixed" by an authority. 53 Pa.C.S. § 5607(d)(9). Accordingly, not only does the MAA provide Authority's customers with the full panoply of procedural rights in the court of common pleas (for which Water Polo has availed itself in this matter), it also provides Authority's customers with the ability to seek pre-enforcement review. Under these circumstances, the trial court did not commit legal error in determining Water Polo's procedural due process rights were not violated.

### F. Improper Tax

Water Polo's sixth argument on appeal is that Authority's charges are improper taxes which have unjustly enriched Authority. We have already determined Water Polo has not unjustly enriched Authority in this matter. Water

16

Polo's only legal authority for the assertion that Authority's charges are an improper tax is *Borough of North East v. A Piece of Land Fronting on West Side of South Lake Street*, 159 A.2d 528 (Pa. Super. 1960). In *Borough of North East*, our Superior Court acknowledged sewer rental fees are not typically taxes. *Id.* at 531. Despite this general rule, our Superior Court determined that when the Borough of North East prohibited a complainant from using the disposal system for 95% of its sewage, yet based its sewer rental fee on 20% of its water use, the customer was being charged an improper tax. *Id.* at 531-32. This matter is readily distinguishable from *Borough of North East*, because the trial court found Authority charges Water Polo on a flat fee basis, not a water consumption basis, and the trial court did not accept Water Polo's assertion that its use of Authority's system was restricted. Upon review, we conclude the trial court's findings are supported by competent evidence and the trial court did not commit an error of law when it determined that Authority's sewer rental fees were not taxes.

## IV. Conclusion

For the reasons outlined above, we affirm the trial court's judgment in this matter.

_____
STACY WALLACE, Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Water Polo III, LP,                        :
                        Appellant          :
                                           :
              v.                           :    No.  1116 C.D. 2021
                                           :
Susquehanna Township Authority             :
and Capital Region Water Authority         :

# **O R D E R**

**AND NOW**, this 1st day of December, 2022, the September 17, 2021 Judgment that the Court of Common Pleas of Dauphin County entered in this matter is hereby **AFFIRMED**.

                                    _____
                                    STACY WALLACE, Judge