IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Water Polo I, L.P., | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 360 C.D. 2022 |
| | : | |
| West Hanover Township | : | |
| Sewer Authority | : | |
| | | |
| Water Polo I, L.P. | : | |
| | : | |
| v. | : | No. 392 C.D. 2022 |
| | : | |
| West Hanover Township Sewer | : | |
| Authority, | : | |
| Appellant | : | Submitted: April 6, 2023 |

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE ELLEN CEISLER, Judge
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE CEISLER                                        FILED: August 15, 2023

Before this Court are cross-appeals filed by Water Polo I, L.P. (Water Polo) and West Hanover Township Sewer Authority (Authority) from the March 18, 2022 Judgment entered by the Court of Common Pleas of Dauphin County (Trial Court) following a non-jury trial.[1] The Trial Court entered judgment in Water Polo's favor on its claim of improper tapping fees in the amount of $146,364.20 and in the Authority's favor on all remaining claims. For the reasons that follow, we affirm in part and reverse in part the Trial Court's Judgment.

---

[1] This Court *sua sponte* consolidated the appeals by Order dated October 28, 2022.

# I. Background

## A. Factual and Procedural History

The Authority is an independent municipal authority that provides sewer services, including a conveyance system and treatment facilities, in West Hanover Township, Dauphin County (Township). Water Polo owns a multi-family apartment complex in the Township known as The Reserve at Manada Hill (Property), which is comprised of 200 apartment units and a clubhouse that are connected to the Authority's sanitary sewer system. The Property has a single water meter for use in water billing. Pennsylvania American Water provides water service to the Property.

The Authority has enacted resolutions establishing the billing structure, tapping fees, and rates for its sewer services. The Authority has two rate classifications: domestic establishments and non-domestic establishments. Resolution 2017-A-1 (Authorizing Resolution) provides:

> "Domestic Establishment" means any room, group of rooms, *apartment*, house trailer, building, or other enclosure connected, directly or indirectly, to the Sewer System and *occupied or intended for occupancy as separate living quarters by a family or any other group of Persons living together or by a Person living alone. Each apartment unit in an apartment facility is considered a Domestic Establishment. Motels and Hotels are excluded from this definition.* In the special case where multiple separate and detached dwelling units are permitted to be constructed on the same Reserve, *each separate dwelling unit shall be a separate Domestic Establishment.*
>
> "Non-Domestic Establishment" means any room group of rooms, building or other enclosure connected, directly or indirectly, to the Sewer System, which does not constitute a Domestic Establishment.

Reproduced Record (R.R.) at 318a-19a (emphasis added). With regard to tapping fees, the Authorizing Resolution states:

2

The tapping fee amount for a Domestic Establishment shall be calculated based on *the unit tapping fee cost per gallon of capacity and the gallons per day per* [*equivalent dwelling unit (EDU)*][2] established in accordance with the requirements of the Municipality Authorities Act[ (MAA), 53 Pa. C.S. §§ 5601-5623]. *No tapping fee amount for a typical Domestic Establishment shall be less than that determined for one . . . EDU. Each Domestic Establishment shall pay a tapping fee.*

*Id.* at 326a (emphasis added).[3]

Resolution 2013-A-2 (Rate Resolution) sets forth the sewer rates for the Authority's customers. The Rate Resolution establishes a flat rate for domestic establishments of $624 per year. *Id.* at 306a.[4] Each apartment unit is considered one EDU for rate purposes. As a domestic establishment, Water Polo is charged a monthly flat rate for each of the 201 units (200 apartment units plus the clubhouse) connected to the Authority's sewer system.

---

[2] "An [EDU] is a unit of measurement for volume of sewage flow, and typically one EDU will correspond to one residence." *J. Buchanan Assocs., LLC v. Univ. Area Joint Auth.*, 231 A.3d 1089, 1091 n.1 (Pa. Cmwlth. 2020).

[3] Our Court has explained "tapping fees" as follows:

When a new residential or commercial customer desires (or is required) to connect to a municipal authority's sewer system, the municipal authority is authorized, pursuant to the MAA, to charge a "tapping fee" to recoup its capital costs incurred in constructing the particular facilities required to provide service to the new customer. The tapping fee is a one-time charge for access to the sewer system; it is not to be confused with a user fee, which is a separate ongoing charge for actual use of the system.

*J. Buchanan*, 231 A.3d at 1091.

[4] At trial, the Authority's manager, Mark Salisbury, testified that the Authority's sewer rental rate for residential customers is "$52 a month, $156 a quarter, $624 a year" and that the rate has been the same since 2012. Notes of Testimony (N.T.), 9/22/21, at 119, 126.

Resolution 2014-A-2 (Tapping Fee Resolution) sets forth the tapping fee rates for new users that connect to the Authority's sewer system. For domestic establishments, the capacity fee is $4,030, the collection fee is $181, and the customer facilities fee is $175. *Id.* at 310a. The Tapping Fee Resolution also sets forth the specific tapping fee calculations for both the capacity and collection components of the sewer system. *Id.* at 312a-14a.[5] Water Polo paid a tapping fee of $4,030 for each of its 201 EDUs for the capacity component, and a $175 customer facilities fee for each of its 10 buildings. Notes of Testimony (N.T.), 9/22/21, at 128-29, 139; Trial Ct. Op., 3/18/22, at 4.[6]

In April 2012, Water Polo submitted a Sewage Facilities Planning Module (sewer module) for the Property to the Township for certification, which Water Polo

---

[5] Section 5607(d)(24)(ii) of the MAA provides:

Every authority charging a tapping, customer facilities or connection fee shall do so only pursuant to a resolution adopted at a public meeting of the authority. The authority shall have available for public inspection a detailed itemization of all calculations, clearly showing the maximum fees allowable for each part of the tapping fee and the manner in which the fees were determined, which shall be made a part of any resolution imposing such fees. A tapping, customer facilities or connection fee may be revised and imposed upon those who subsequently connect to the system, subject to the provisions and limitations of the [MAA].

53 Pa. C.S. § 5607(d)(24)(ii).

[6] Mr. Salisbury testified that the tapping fee rates were "$4,031.08 for the capacity component and $181.52 for the collect component," but the Authority "did not use the collection component with [the Property]." N.T., 9/22/21, at 128-29. Mr. Salisbury clarified that the Authority charged Water Polo a tapping fee of $4,030 per EDU by rounding down from $4,031.08. *Id.* at 139. The Trial Court found that Water Polo was charged $4,030 per EDU for the capacity component, plus "each building in the apartment complex was charged $175 as a Customer Facilities Fee." Trial Ct. Op., 3/18/22, at 4. The Trial Court ultimately determined that Water Polo "was charged approximately $811,955.00 in tapping fees for the entire Property." *Id.*

4

revised in April 2013.[7] The sewer module identified average collection flows of 35,000 gallons per day and projected peak flows of 140,000 gallons per day. R.R. at 422a. In October 2013, the Pennsylvania Department of Environmental Protection (DEP) approved Water Polo's sewer module "consisting of 200 apartment units with flows of 35,000 gallons of wastewater per day, to be served by [the Authority's] sewage collection, conveyance and treatment system." *Id.* at 450a.

On June 15, 2017, Water Polo filed a Complaint against the Authority in the Trial Court, which it amended on July 31, 2017. In its First Amended Complaint, Water Polo asserted the following claims against the Authority: improper tapping fees; improper usage charges in violation of the MAA; unjust enrichment; violation of procedural due process rights under the United States and Pennsylvania Constitutions; and violation of equal protection rights under the United States and Pennsylvania Constitutions and 42 U.S.C. § 1983 (relating to violations of civil rights).[8]

Specifically, Water Polo averred that the Authority charged improper tapping fees for the Property's initial connection to the sewer system. First Am. Compl. ¶¶ 77-78, 87-91. Water Polo averred that the tapping fees were improper, in part, because they did not "properly reflect actual sewer flows" and did not "accurately reflect the number of [the Property's] 'connections' to the sewer system." *Id.* ¶ 91. Water Polo also challenged the reasonableness of the Authority's monthly rates, averring that the "[s]ewer fees are not billed on usage, despite the use of a meter at

---

[7] Section 5(a.1) of the Pennsylvania Sewage Facilities Act, Act of January 24, 1966, P.L. (1965) 1535, *as amended*, 35 P.S. § 750.5(a.1), requires each municipality to certify the amount of sewer that a proposed land development project will utilize in the sewer system.

[8] Section 5607(d)(9) of the MAA vests the court of common pleas with "exclusive jurisdiction to determine questions involving rates or service." 53 Pa. C.S. § 5607(d)(9).

the [P]roperty" and that "[t]he billing for sewer is the same each month even if units are not occupied and do not use sewer treatment services." *Id.* ¶¶ 18-19. Water Polo further averred that the Property should be classified as commercial, rather than residential, because (1) it is more akin to commercial establishments such as hotels and nursing homes, and (2) it is more equitable to charge Water Polo for the amount of sewage the Property actually discharges into the system rather than impose a flat rate. *Id.* ¶¶ 112, 115, 126.

In its prayer for relief, Water Polo sought to recover, *inter alia*, "the amount of overbilling plus interest for overcharges accruing as of the date of this Complaint, future charges that accrue during litigation with interest[], costs and any additional monetary amounts that the [Trial] Court may determine." First Am. Compl. at 25. Water Polo also requested "that the fee[s] be declared . . . improper and stricken as violative of the powers granted to [m]unicipal [a]uthorities pursuant to the Due Process/Equal Protection Clauses of the United States Constitution and [the] Pennsylvania Constitution." *Id.*

On October 2, 2018, the Authority filed its Answer and New Matter, averring, *inter alia*, that its rate classification system and the tapping fees and monthly charges imposed on Water Polo were reasonable and uniform under the MAA.

The Trial Court held a non-jury trial on September 22, 2021. Much of the evidence at trial involved the Authority's tapping fees and monthly sewer charges and how they were calculated. We address the testimony and evidence relevant to the issues on appeal in Section II of this Opinion.

**B. Trial Court's Verdict and Opinion**

On March 18, 2022, following additional briefing and argument by the parties, the Trial Court entered judgment in Water Polo's favor on its claim of improper

6

tapping fees in the amount of $146,364.20. The Trial Court entered judgment in the Authority's favor on all other claims.

In its accompanying Memorandum Opinion, the Trial Court first explained its ruling on tapping fees. The Trial Court observed that "the MAA establishes the guidelines and parameters that a municipal authority must follow when 'calculating and recovering the value of its capital costs to provide the parts of the system required by the new user.'" Trial Ct. Op., 3/18/22, at 3 (quoting *J. Buchanan*, 231 A.3d at 1102). Specifically, the Trial Court relied on Section 5607(d)(24)(i)(C)(I) of the MAA, which provides:

> *A tapping fee shall not exceed an amount based upon some or all of the following parts which shall be separately set forth in the resolution adopted by the authority to establish these fees. . . .*
>
> > (I) Capacity part. *The capacity part shall not exceed an amount that is based upon the cost of capacity-related facilities, including, but not limited to, source of supply, treatment, pumping, transmission, trunk, interceptor and outfall mains, storage, sludge treatment or disposal, interconnection or other general system facilities . . . .* For tapping fees or components related to facilities initially serving exclusively new customers, an authority may, no more frequently than annually and without updating the historical cost of or subtracting the outstanding debt related to such facilities, increase such tapping fee by an amount calculated by multiplying the tapping fee by the weighted average interest rate on the debt related to such facilities applicable for the period since the fee was initially established or the last increase of the tapping fee for such facilities. *The capacity part of the tapping fee per unit of design capacity of said facilities required by the new customer shall not exceed the total cost of the facilities as described herein divided by the system design capacity of all such facilities. . . .*

53 Pa. C.S. § 5607(d)(24)(i)(C)(I) (emphasis added).[9]    Further, Section 5607(d)(24)(i)(C)(V)(e) of the MAA provides:

> [T]he design capacity required by a new residential customer used in calculating sewer . . . tapping fees *shall not exceed an amount established by multiplying . . . 90 gallons per capita per day for sewer capacity times the average number of persons per household* as established by the most recent census data provided by the United States Census Bureau.

*Id.* § 5607(d)(24)(i)(C)(V)(e) (emphasis added).[10]

The Trial Court noted that in *J. Buchanan*, this Court explained that the MAA's tapping fee provisions "ensure[] that a new customer 'does not pay more per unit than what it cost the municipal authority per unit to provide its capacity and collection related services.'"  Trial Ct. Op., 3/18/22, at 3 (quoting *J. Buchanan*, 231 A.3d at 1102).

Applying the tapping fee provisions of the MAA to the evidence presented at trial, the Trial Court found:

> [Water Polo] was charged a tapping fee for each of the two hundred apartments on the Property plus the clubhouse.  Specifically, each of the two hundred apartments and the clubhouse was charged a tapping fee of $4,030 for the capacity component.  Moreover, each building in the apartment complex was charged $175 as a Customer Facilities Fee.  Each building consists of 20 apartments.  *Based on these numbers, it appears that* [*Water Polo*] *was charged approximately $811,955.00 in*

---

[9] This subsection of Section 5607(d)(24) relating to tapping fees also includes "(II) Distribution or collection part," "(III) Special purpose part," and "(IV) Reimbursement part." However, only the capacity part is at issue here.

[10] The record shows that the average number of persons per household in the Township, as of the most recent census, is 2.47 persons; pursuant to Section 5607(d)(24)(i)(C)(V)(e) of the MAA, 2.47 persons multiplied by 90 gallons equals 222.3, rounded down to *222 gallons per day of sewer flow per EDU.*  N.T., 9/22/21, at 106-07, 176.

8

*tapping fees for the entire Property, including ten buildings of twenty apartments each and one building with the clubhouse.*

*[Water Polo] argues that the definition of an [EDU] within [the Authority's] service area equates to 222 gallons per day of sewer usage. However, based on the sewer module that was submitted to [DEP], [Water Polo] argues that it should have only paid for 158 tapping fees based on the module approval of 35,000 gallons per day and the tapping fee definition of 222 gallons per day. In other words, [Water Polo] was charged a tapping fee as if [it] would use 49,500 gallons per day, but [it was] only certified to use 35,000 gallons per day.*

Trial Ct. Op., 3/18/22, at 4 (internal citation and footnote omitted).

To calculate the tapping fees that Water Polo should have been charged, the Trial Court relied on the Authority's Exhibit 14, which "defines an EDU as using 222 gallons per day based on an average of 2.47 persons per household." *Id.* at 4-5. The Trial Court then explained:

[T]he total maximum tapping fee amount per gallon per day is set forth as $18.13 for the capacity component and $0.82 for the collection component. Thus, *based on an EDU of 222 gallons per day, the maximum tapping fee amount that can be charged per EDU is $4,031.08 for the capacity component and $181.52 for the collection component.*

However, the Property was only certified with a capacity of 35,000 gallons per day. Thus, *based on the definition of EDU in [the Authority's] own tapping fee calculations, [Water Polo] should have only been charged for one hundred fifty-eight (158) EDU[]s instead of two hundred one (201)[ EDUs]. Otherwise, [Water Polo] is paying more per unit than it cost [the Authority] to provide its capacity and collection related services, which is prohibited by the MAA.*

*Taking the maximum amount that can be charged per EDU for both capacity and collection and multiplying that by the 158[] EDU[]s that [Water Polo] should have been charged equals $665,590.80.*

9

*Id.* at 5 (emphasis added). Therefore, the Trial Court concluded that Water Polo "was overcharged in the amount of $146,364.20, and [the Authority] must repay this amount to [Water Polo]." *Id.* at 5.

Next, the Trial Court rejected Water Polo's claim that the Authority was unjustly enriched by the monthly charges it collected from Water Polo for the Property. The Trial Court first determined that it was reasonable for the Authority to classify Water Polo as residential, rather than commercial, "because apartments are places where people reside in the same way that people reside in single[-]family homes or townhomes. People don't generally consider a hotel or a hospital to be their home or the place where they reside." *Id.* at 7-8. The Trial Court then concluded:

> [The Authority] does not base its rates on actual water usage. Rather, *it bases its rates on the annual expenses that are necessary to keep the sewage system in good condition, including any necessary maintenance costs, construction costs, and/or repair costs.* It is certainly possible that a majority of residential users are paying more in sewage rates than they are actually using, including residents of single-family homes. However, *all of the residential users, including the [201] units of [Water Polo's] Property, are hooked up to the sewer system and obtain a benefit from said system. Thus, it is reasonable for all residential units, including the ones contained in [the] Property, to pay a . . . flat fee towards the costs associated with maintaining that system*.
>
> . . . .
>
> [*The Authority*] *is basing its rates on the amount of annual expenses that it has to pay to maintain the sewage system that* [*Water Polo*] *clearly benefits from.* [*The Authority*] *is permitted to do this under the MAA*. There is no requirement that a municipality base its rates on actual water or sewer consumption. *It is reasonable for* [*the Authority*] *to classify* [*the*] *Property as residential units and to charge* [*Water Polo*] *a flat fee per unit.* Therefore, we find that [the Authority] has not been unjustly enriched under the facts of this case.

10

*Id.* at 8 (emphasis added).

Finally, the Trial Court rejected Water Polo's constitutional claims, finding that Water Polo failed to "provide any evidence of any violation of its due process rights, either substantive or procedural," nor any "evidence to support a finding that [its] rights to equal protection were violated." *Id.* at 9.

Thereafter, both parties filed Post-Trial Motions. On August 18, 2022, following oral argument, the Trial Court denied both Post-Trial Motions for the reasons set forth in its prior Memorandum Opinion. These cross-appeals followed.[11]

## II. Analysis

Water Polo's appeal challenges the validity and constitutionality of the monthly sewer charges imposed by the Authority. The Authority's cross-appeal challenges only the Trial Court's ruling that it overcharged Water Polo for tapping fees.

### A. Water Polo's Appeal

### 1. Unjust Enrichment

First, Water Polo asserts that the Authority has been unjustly enriched by overcharging Water Polo for sewer usage on a monthly basis. Water Polo asserts that despite the 35,000-gallon-per-day sewer capacity approved by DEP, Water Polo pays monthly charges equating to 49,500 gallons per day. Water Polo contends that these monthly charges exceed the actual benefit conferred on Water Polo, thereby unjustly enriching the Authority. We disagree.

---

[11] "This Court's scope of review of a judgment following a non-jury trial is to determine whether the findings of the trial court are supported by competent evidence, and whether the [trial] court committed error in the application of law." *Com. v. Hoffman*, 938 A.2d 1157, 1160 n.10 (Pa. Cmwlth. 2007) (citation omitted). "[T]his Court may not reweigh the evidence [or] substitute [its] judgment for that of the factfinder." *Id.*

11

Unjust enrichment is a quasi-contractual doctrine based in equity. *See Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. 1993). To prove an unjust enrichment claim, the plaintiff must establish that (1) it conferred benefits on the defendant, (2) the defendant appreciated those benefits, and (3) the defendant accepted and retained those benefits "'under such circumstances that *it would be inequitable for* [the defendant] *to retain the benefit without payment of value*.'" *Filippi v. City of Erie*, 968 A.2d 239, 242 (Pa. Cmwlth. 2009) (citation omitted) (emphasis added). "In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Id.* Importantly, the plaintiff "must show that the party against whom recovery is sought *either 'wrongfully secured or passively received a benefit that it would be unconscionable for* [*he or she*] *to retain*.'" *Limbach Co., LLC v. City of Phila.*, 905 A.2d 567, 575 (Pa. Cmwlth. 2006) (citation omitted) (emphasis added).

Recently, in *Water Polo III, LP v. Susquehanna Township Authority* (Pa. Cmwlth., No. 1116 C.D. 2021, filed December 1, 2022), this Court considered an unjust enrichment claim brought by Water Polo III, LP (Water Polo III) against another municipal sewer authority under substantially similar facts.[12] In that case, Water Polo III owned an apartment complex comprised of 160 rental units and a clubhouse that were connected to the authority's sewer system, and the authority charged Water Polo separately for 161 residential units.

Water Polo III filed an action in the trial court challenging the authority's rate structure.[13] After a non-jury trial, the trial court found that the authority's regulations

---

[12] Pursuant to our Court's Internal Operating Procedures, we may cite unreported panel decisions of this Court, issued after January 15, 2008, for their persuasive value. 210 Pa. Code § 69.414(a).

defined apartments as residential, rather than commercial, units, and the authority charged residential customers a flat fee. The trial court noted that the authority's sewer rates were based on the annual expenses of maintaining the sewage system, not the quantity of sewer waste generated by each unit. The trial court also found that all of Water Polo III's apartment units benefited from being connected to the authority's sewer system. Therefore, the trial court concluded that "'it [was] reasonable for all residential units, including the ones contained in [Water Polo III's p]roperty, to pay a quarterly fee towards the costs associated with maintaining the system.'" *Id.*, slip op. at 7 (quoting trial court opinion).

On appeal to this Court, Water Polo III argued, *inter alia*, that the trial court erred in concluding that the authority was not unjustly enriched by collecting excessive sewer charges. Like Water Polo in this case, Water Polo III asserted that the authority's charges exceeded the actual sewer capacity available to and approved for the property. In rejecting this claim, this Court concluded:

> The trial court determined [that] Water Polo [III] did not prove its unjust enrichment claim, as *Water Polo* [*III*] *failed to show* [*that the a*]*uthority accepted and retained its sewer payments under inequitable circumstances.* As outlined above, [*the a*]*uthority's classification of Water Polo*[ *III*]*'s apartment units as separate residential units is reasonable and permitted under the MAA. Water Polo*[ *III*]*'s water consumption and the sewage flow estimates* [*the a*]*uthority provided to DEP in sewer planning are not relevant to how* [*the a*]*uthority classifies Water Polo* [*III*] *for sewer rates.* In addition, the trial court did not

---

[13] The trial judge in *Water Polo III* was the same trial judge who presided over the instant proceedings. In fact, at the outset of the trial in this case, the parties' counsel and the trial judge discussed the factual and legal similarities between the two cases and acknowledged that the only substantive difference between them was that, unlike *Water Polo III*, this case also involved a claim of improper tapping fees. *See* N.T., 9/22/21, at 8-10; *see also* Trial Ct. Op., 3/18/22, at 2 n.2 (noting that *Water Polo III* "involved very similar facts to the instant matter" and, for that reason, the Trial Court "adopt[ed] and incorporate[d] the majority of that decision" into its March 18, 2022 opinion in this case).

13

accept Water Polo[ III]'s assertion that [the a]uthority limited its sewer capacity. As a result, we conclude the trial court's findings are supported by competent evidence, and the trial court did not commit legal error in determining Water Polo [III] failed to prove its unjust enrichment claim.

*Water Polo III*, slip op. at 14 (emphasis added).

Water Polo's unjust enrichment claim in this case is indistinguishable from the unjust enrichment claim at issue in *Water Polo III*. Therefore, for the reasons set forth in *Water Polo III*, which we find persuasive, we conclude that Water Polo failed to prove that the Authority was unjustly enriched.

## 2. **Reasonableness of Monthly Charges**

Echoing the arguments in support of it unjust enrichment claim, Water Polo next asserts that the monthly charges imposed by the Authority are unreasonable because they are not based on actual usage and exceed the sewer flow capacity certified in the sewer module. Specifically, Water Polo argues:

[T]he evidence is clear that Water Polo does not actually use the amount of gallons that equates to an EDU at any time. The evidence is also clear that, based upon the [sewer] module certification, the amount readily available for use is only 35,000 gallons per day. Despite those limitations, [the Authority] charges Water Polo for amounts not available based upon the limited module certification.

Water Polo Br. at 21. Thus, Water Polo contends that the Authority's monthly charges are neither reasonable nor uniform as required by the MAA.

Section 5607(d)(9) of the MAA provides that a municipal authority has the power

to fix, alter, charge and collect rates and other charges in the area served by its facilities at *reasonable and uniform rates to be determined exclusively by it for the purpose of providing for the payment of the*

14

*expenses of the authority, the construction, improvement, repair, maintenance and operation of its facilities and properties. . . .*

53 Pa. C.S. § 5607(d)(9) (emphasis added). This Court has recognized that "[t]he MAA provides municipal authorities with *significant discretion to impose fees and charges*[] *. . . for the construction and maintenance of its facilities*." *J. Buchanan*, 231 A.3d at 1104 (emphasis added). However, an authority's rates must be "reasonably proportional to the value of the service rendered." *W. Clinton Cnty. Mun. Auth. v. Rosamilia*, 826 A.2d 52, 57 (Pa. Cmwlth. 2003). With regard to reasonableness, "[i]t is the burden of the party challenging a rate structure to prove that there has been a manifest and flagrant abuse of discretion or an arbitrary establishment of the rate system." *Ack v. Carroll Twp. Auth.*, 661 A.2d 514, 517 (Pa. Cmwlth. 1995).

This Court has held that "sewage rates need not be proportioned with exactness to the use made or the cost to the individual customer, so long as it is *reasonably related to the cost of maintaining the service for all the customers, and the customers challenging the rates receive 'some' benefit from the system*." *Ack*, 661 A.2d at 518 (emphasis added); *see also Wash. Realty Co., Inc. v. Municipality of Bethel Park*, 937 A.2d 1146, 1150 (Pa. Cmwlth. 2007) (in upholding the reasonableness of a municipal authority's sewer charges, this Court observed that "the mere fact that a parcel of property is connected to a sewage system provides value to the premises" and "that connection must be maintained whether or not it is used").

In *Water Polo III*, this Court upheld as reasonable the same flat-rate billing structure imposed by a municipal sewer authority on an apartment complex like the Property at issue here. We began our analysis in *Water Polo III* by recognizing that "[o]ur Court has previously upheld rate structures that are similar to [the a]uthority's

15

rate structure." *Water Polo III*, slip op. at 9 (citing *Chicora Commons Ltd. P'ship, LLP v. Chicora Borough Sewer Auth.*, 922 A.2d 986 (Pa. Cmwlth. 2007)).  We noted that in *Chicora*, a sewer authority charged an apartment complex for sewer services at a residential flat rate for each of its 27 units.  *Id.*  The apartment complex in *Chicora* argued that the flat-rate billing system did not bear "'a reasonable relationship to the services actually consumed because it paid for services at a rate at least three times greater than the amount actually consumed.'"  *Id.* (citation omitted).  The *Chicora* Court ultimately upheld the flat-rate system as reasonable under the MAA.  *Id.*, slip op. at 9-10.  Applying *Chicora*'s reasoning to the facts of *Water Polo III*, this Court held:

> We discern no significant distinctions between [the a]uthority's rate structure in this matter and [the authority's] rate structure in *Chicora*. *The trial court's finding that Water Polo [III] obtains a benefit from [the a]uthority's sewage system was supported by competent evidence in this matter.  The trial court's finding that [the a]uthority's rates are tied to the annual expenses of maintaining the sewage system was also supported by competent evidence.*  Thus, like in *Chicora*, [*the a*]*uthority's rate structure is "not arbitrary or unreasonably related to the value of services rendered either as actually consumed, or readily available for use."*  Accordingly, we conclude the trial court did not commit an error of law when it determined [the a]uthority's rate structure does not violate the MAA.

*Id.*, slip op. at 10 (internal citation omitted).

Similarly, the Trial Court in this case found, based on the credible evidence of record, that the Authority "bases its rates on the annual expenses that are necessary to keep the sewage system in good condition, including any necessary maintenance costs, construction costs, and/or repair costs."  Trial Ct. Op., 3/18/22, at 8; *see* N.T., 9/22/21, at 127-28 (the Authority's manager testified that the monthly sewer rates pay for "the [Authority's] debt service," "operation and maintenance of the

16

facilities," "salaries and insurances[,] and all other costs involved with running the pump stations, treatment system, and the removal of biosolids"). The Trial Court further determined:

> The rates set forth are established by [the Authority's] Board of Directors based on the yearly budget. The budget incorporates all expenses incurred by [the Authority], including maintenance of the system, operating costs, administrative costs, and any debt services that [the Authority] has. [*Water Polo*] *has not presented any evidence that any of the items on this budget are unreasonable or overly inflated. The sewer rates that are established for Domestic Establishments and Non-Domestic Establishments are not tied into the number of gallons of sewer waste that is generated by a home or apartment on a daily basis. Rather, [they are] tied to the annual expenses of maintaining the sewage system.*

Trial Ct. Op., 3/18/22, at 7 (emphasis added). Thus, consistent with this Court's decisions in *Water Polo III* and *Chicora*, we conclude that the monthly charges the Authority imposed on Water Polo were reasonable.

We further conclude that the Authority's monthly rates are uniform, because the record shows that all residential customers, including Water Polo, are charged the same flat rate. *See* R.R. at 306a; N.T., 9/22/21, at 56; *see also Chicora*, 922 A.2d at 995 (upholding the authority's imposition of flat-rate billing on an apartment complex where "'[a]ll apartments are treated uniformly[,] and each is billed as one [EDU],'" and noting that "'[f]lat[-]rate structures are permitted under Pennsylvania law'") (citation omitted); *Glen Riddle Park, Inc. v. Middletown Twp.*, 314 A.2d 524, 527 (Pa. Cmwlth. 1974) ("[A] municipality may create classifications of users *so long as the charge is uniform within the classification and is reasonably proportional to the service rendered.*") (emphasis added).

Here, the record establishes, and the Trial Court found, that the Authority's rate system is reasonably intended to allocate the costs of sewer service among its residential users, while ensuring that sufficient funds are collected to cover the actual costs the Authority pays to maintain its sewage system. *See* Trial Ct. Op., 3/18/22, at 7-8. Therefore, we conclude that the monthly sewer charges the Authority imposed on Water Polo were both reasonable and uniform under the MAA.

### 3. Procedural Due Process

Next, Water Polo asserts that its procedural due process rights were violated by the Authority's failure to provide a formal process at the administrative level for customers to challenge its rates.[14] Water Polo argues:

> [T]he issue is not whether [the Authority's] procedures are adequate, but rather *whether any procedure*[] *even exists or a process exists in rate procedures or regulations to appeal rates or to raise concerns regarding billing.* Merely having monthly public meetings is not enough of a process to satisfy the standard required for an orderly process with meaningful review and opportunity to be heard in the context of a challenge to sewer rates.

Water Polo Br. at 24-25 (emphasis added).

"The due process standards of the United States and Pennsylvania Constitutions are essentially the same." *J.P.*, 170 A.3d 580. "[T]he basic elements of procedural due process are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." *Com. v. Turner*, 80 A.3d 754, 764 (Pa. 2013). Procedural due process is

---

[14] The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that "no State shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Pennsylvania Supreme Court has held that the guarantee of due process of law in Pennsylvania jurisprudence emanates from Article I, Sections 1, 9, and 11 of the Pennsylvania Constitution." *J.P. v. Dep't of Hum. Servs.*, 170 A.3d 575, 580 (Pa. Cmwlth. 2017).

a flexible concept that "imposes only such procedural safeguards as the situation warrants." *In re McGlynn*, 974 A.2d 525, 531 (Pa. Cmwlth. 2009).

Despite the Authority's lack of a specific *administrative* process to challenge its rates, Section 5607(d)(9) of the MAA provides:

> *Any person questioning the reasonableness or uniformity of a rate fixed by an authority or the adequacy, safety and reasonableness of the authority's services, including extensions thereof, may bring suit against the authority in the court of common pleas of the county where the project is located* or, if the project is located in more than one county, in the court of common pleas of the county where the principal office of the project is located.

53 Pa. C.S. § 5607(d)(9) (emphasis added). Section 5607(d)(9) also vests the courts of common pleas with "exclusive jurisdiction to determine questions involving rates or service." *Id.*

Here, in accordance with Section 5607(d)(9) of the MAA, Water Polo filed the present action in the Trial Court challenging its rate classification and the reasonableness of the Authority's rates. Notably, in *Water Polo III*, this Court found no procedural due process violation under the same facts, because "not only does the MAA provide [the a]uthority's customers with the full panoply of procedural rights in the court of common pleas (for which Water Polo [III] has availed itself in this matter), it also provides [the a]uthority's customers with the ability to seek pre-enforcement review." *Water Polo III*, slip op. at 16. Therefore, because Water Polo availed itself of the statutorily guaranteed procedure for challenging the Authority's rates, we conclude that Water Polo's procedural due process claim lacks merit.[15]

---

[15] In any event, the record shows that, prior to filing the present action, Water Polo challenged the Authority's rates on several occasions before the Authority's board of directors. *See* R.R. at 303a (in an April 20, 2012 letter, the Authority's chairman informed Water Polo that,

19

### 4. **Substantive Due Process**

Water Polo also asserts that the Authority's rate structure violates Water Polo's substantive due process rights. Water Polo asserts:

> The right set forth is not the right to obtain sewer service, but *the property right of not facing abusive and unregulated utility fees without input or process*. Moreover, such right as asserted is a right to be free from improper treatment by a government entity once they have established an exclusive property right through providing a service – only to then gouge users when there is no regulation of that service.
>
> Water Polo is not claiming that it has a right for a governmental entity to provide sewer to its [P]roperty. Rather, it is claiming that once a government steps into a role as a utility provider, then a right has been established.

Water Polo Br. at 26 (emphasis added).

"The substantive protections of due process are meant to protect citizens from arbitrary and irrational actions of the government." *Gresock v. City of Pittsburgh Civ. Serv. Comm'n*, 698 A.2d 163, 169 (Pa. Cmwlth. 1997). Like procedural due process, "for substantive due process rights to attach[,] there must first be the deprivation of a[n] . . . interest that is constitutionally protected." *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004).

Here, aside from citing a single federal case that is factually distinguishable,[16] Water Polo fails to develop its substantive due process claim in any meaningful way

---

during its regular meeting, the board had denied Water Polo's request for reduced tapping fees); N.T., 9/22/21, at 50, 57-58, 133-34 (the Authority's manager testified that Water Polo representatives had attended Authority board meetings and had asked the board to reduce its tapping fees and to bill Water Polo on a metered, rather than a flat rate, basis).

[16] Water Polo cites only *Johnson v. City of Saginaw, Michigan*, 980 F.3d 497 (6th Cir. 2020), for the proposition that "the courts have found [that] sewer and water is essential." Water

with citation to relevant legal authority in its appellate brief. Therefore, we conclude that Water Polo has waived this claim. *See Com. v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop an issue in any other meaningful fashion capable of review, that claim is waived."); Pa.R.A.P. 2119(a) (stating that each point in an argument must be "followed by such discussion and citation of authorities as are deemed pertinent").

### 5. **Equal Protection**

Finally, Water Polo asserts that its equal protection rights have been violated by the Authority's classification of the Property as residential rather than commercial for rate purposes.[17]  Specifically, Water Polo argues that the Authority's "rate structure . . . clearly treats apartments and hotels differently based upon the arbitrary distinction of length of stay . . . with no rational basis for doing so." Water Polo Br. at 29-30.  Water Polo contends that this distinction "is inappropriate given

---

Polo Br. at 25. In *Johnson*, the plaintiff alleged that city officials violated her procedural and substantive due process rights by shutting off the water supply to her commercial business without notice. In ruling on the plaintiff's substantive due process claim, the federal appeals court recognized that her "expectation of utility services" rose to the level of a protected property interest under the federal Due Process Clause. In this case, however, there is no allegation or evidence that Water Polo was ever deprived of sewer service so as to trigger a substantive due process claim. As explained above, Water Polo cites no legal authority to support its contention that a substantive due process claim can be premised on an allegation of excessive sewer charges absent a deprivation of service.

[17] The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Article I, Section 26 of the Pennsylvania Constitution provides "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa. Const. art. I, § 26.

21

that [the Property's] facilities are more closely comparable to hotels than single-family residential properties." *Id.* at 28.

In *Water Polo III*, this Court rejected the same equal protection claim that Water Polo asserts here. We concluded:

Water Polo [III] asserts it should be treated as a commercial user because apartment units are more like some commercial uses (hotels) than other residential uses (single-family homes and townhomes). Thus, Water Polo [III] is not challenging the classification system itself, but the line between the two classifications.

As our Supreme Court outlined in *Lohr* [*v. Saratoga Partners, L.P.*, 238 A.3d 1198, 1211 (Pa. 2020) (citation omitted)], however, "'[a] classification does not fail rational[ ]basis review because it is not made with mathematical nicety or because in practice it results in some inequality.'" *We agree with the trial court that apartments, like homes and townhomes, are places one considers as their permanent residence, whereas hotels and motels are not. The trial court did not commit an error of law when it concluded that Water Polo* [*III*] *did not present evidence to show this distinction was unreasonable or arbitrary.* Although Water Polo [III] presented evidence regarding its water consumption, Water Polo [III] did not present any evidence regarding water consumption for the uses it alleges are similar to its use (hotels and motels). *The presence of similar amenities (which is also true for apartments, townhomes, and some single-family residences) is not the same as similar sewer usage. As a result, Water Polo* [*III*] *did not establish that it is similar, in terms of sewer usage, to a hotel or motel. Thus, despite some perceived inequality and a lack of mathematical nicety,* [*the a*]*uthority's classifications do not fail rational basis review*, and the trial court did not commit an error of law in determining [the a]uthority's rate classifications do not violate Water Polo[ III]'s equal protection rights.

*Water Polo III*, slip op. at 13 (internal citation omitted) (emphasis added).

Here, as in *Water Polo III*, Water Polo failed to establish that the Property is similar, in terms of sewer usage, to a commercial establishment such as a hotel or

22

motel. While Water Polo offered some testimony regarding the similarity between motels and apartments in terms of their physical attributes and amenities, *see* N.T., 9/22/21, at 45, 47-48, it offered no evidence establishing their similarity in terms of sewer usage. *See* Trial Ct. Op., 3/18/22, at 9 (finding no evidence of an equal protection violation). Thus, for the reasons outlined in *Water Polo III*, we conclude that Water Polo failed to prove an equal protection violation based on its classification as a domestic establishment.

## B. The Authority's Appeal

In its cross-appeal, the Authority challenges the Trial Court's conclusion that Water Polo was overcharged for tapping fees. In particular, the Authority contends that the Trial Court misapplied this Court's holding in *J. Buchanan* when it re-calculated Water Polo's tapping fees based on the projected 35,000-gallon-per-day capacity in the sewer module, as such a calculation is unsupported by either the MAA or our case law. We agree.

Section 5607(d)(24)(i)(C) of the MAA authorizes the Authority to collect tapping fees from "owners who desire to or are required to connect to the authority's sewer or water system." 53 Pa. C.S. § 5607(d)(24)(i)(C). As stated earlier, the MAA "provides municipal authorities with *significant discretion* to impose fees and charges, *including tapping fees*, for the construction and maintenance of its facilities." *J. Buchanan*, 231 A.3d at 1104 (emphasis added). The party challenging the tapping fees imposed has the burden "to show that the municipal authority abused its discretion or that the rate system or charge established is arbitrary or unreasonable." *Id.*

We begin our analysis of this issue with a review of *J. Buchanan*, this Court's most recent pronouncement on the calculation of sewer tapping fees, albeit in the

23

context of a non-residential customer.  In *J. Buchanan*, the owner of an office building, J. Buchanan Associates, LLC (Buchanan), filed an action against a municipal sewer authority, alleging that the authority overcharged it for the tapping fee to connect the building to the sewer system.  The basis of Buchanan's complaint was as follows:

> The [a]uthority charged Buchanan a $32,977 tapping fee, which was the equivalent of seven times the tapping fee for a single residential dwelling, measured in [EDUs].  That is, the [a]uthority used a residential unit, i.e., an EDU, as the standard unit for measuring units of discharge, and converted Buchanan[]'s estimated sewage flow into EDUs.  Buchanan disagreed with the amount of the tapping fee, but paid it under protest and connected to the system.

*Id.* at 1091 (footnote omitted).  Following the disposition of preliminary objections, which resulted in the dismissal of the complaint, Buchanan appealed to this Court.

On appeal to this Court, Buchanan argued, *inter alia*, that the trial court erred in concluding that the authority may charge tapping fees by assigning EDUs, arguing instead that the authority should calculate tapping fees on the basis of anticipated or actual flow rates.  *Id.* at 1097, 1099.  Buchanan further argued that under the MAA, a tapping fee must be limited to its proportionate gallon-per-day flow requirements, or its "design capacity."  *Id.* at 1100 (citing 53 Pa. C.S. § 5607(d)(24)(i)(C)(I)).

This Court disagreed with Buchanan's arguments.  In interpreting and applying the tapping fee provisions of the MAA, this Court held:

> [*W*]*e conclude that the* [*a*]*uthority charged Buchanan a tapping fee in a manner consistent with* [*S*]*ection 5607(d)(24) of the MAA, 53 Pa.[ ]C.S. § 5607(d)(24).  For one,* [*S*]*ection 5607(d)(24) of the MAA, as amended by Act 57,*[18] *does not address how municipal authorities*

---

[18] "In December 2003, the MAA was amended by the Act of December 30, 2003, P.L. 404, No. 57 (Act 57)."  *J. Buchanan*, 231 A.3d at 1093.

24

must, at the end of the day, charge an owner of a nonresidential property a tapping fee after calculating the Capacity and Collection parts. *It also does not, contrary to Buchanan's contention, require the authority to make individualized assessments of the expected use of each customer.* Instead, the tapping fee provisions of the MAA at 53 Pa.[ ]C.S. § 5607(d)(24)(i)(C) establish the guidelines and parameters a municipal authority must follow when calculating and recovering the **value** of its capital costs of providing the parts of the system required by the new user. *The tapping fee provisions of the MAA ensure a new customer does not pay **more per unit than** what it cost the municipal authority per unit to provide its capacity and collection related services. In other words, the Capacity and Collection parts of the new customer's tapping fee **per unit** cannot be more than what it has **cost** the authority **per unit** to provide these services required by the new customer.* [*See*] 53 Pa.[ ]C.S. § 5607(d)(24)(i)(C)(I) ("The capacity part of the tapping fee per unit of design capacity of said facilities required by the new customer **shall not exceed** the total cost of the facilities as described herein divided by the system design capacity of all such facilities.") (emphasis added). 53 Pa.[ ]C.S. § 5607(d)(24)(i)(C)(II) ("The distribution or collection part of the tapping fee per unit of design capacity of said facilities required by the new customer **shall not exceed** the cost of the facilities divided by the design capacity.") (emphasis added). The language of the MAA is crystal clear. *We do not agree with Buchanan that these provisions reflect a mandatory pro rata limitation that requires a user to pay for collection facilities only to the extent of its esoteric design capacity requirements in such facilities.*

*Id.* at 1101-02 (footnote omitted) (bold and underlining in original; italics added).

The Court went on to state, however, that a new customer's design capacity is not irrelevant, as it is used to calculate both the capacity and collection components of the tapping fee. *Id.* at 1102; *see* 53 Pa. C.S. § 5607(d)(24)(i)(C)(VII).

In this case, the record shows that the Authority calculated its tapping fee rate in the same manner as the authority in *J. Buchanan*. *See J. Buchanan*, 231 A.3d at 1094-95. The Authority determined the MAA's maximum allowable design capacity for a residential connection by multiplying 90 gallons per day by the

average number of persons per household in the Township, which is 2.47 (90 x 2.47 = 222.3, rounded down to 222). It then multiplied the Authority's cost per unit of design capacity for its capacity facilities ($18.13 per gallon per day) by the maximum allowable design capacity for a residential connection (222 gallons) to determine the capacity part of the tapping fee ($4,031.60, rounded down to $4,030). In accordance with its Tapping Fee Resolution, the Authority then applied the tapping fee of $4,030 per EDU, i.e., per domestic establishment, to the Property ($4,030 x 201 EDUs).

Before this Court, Water Polo acknowledges that "[t]he Authority followed necessary procedure to establish its tapping fees and make available to the public its methodology for calculating such fees." Water Polo Cross-Appeal Br. at 6. Yet Water Polo asserts, and the Trial Court found, that it should have paid only 158 tapping fees, rather than 201 tapping fees, based on the sewer module certification of 35,000 gallons of sewer flow per day. *Id.* at 7; Trial Ct. Op., 3/18/22, at 4-5. In other words, Water Polo contends that the certification of projected flow in a sewer planning module dictates the number of EDUs used to calculate tapping fees. However, Water Polo cites no legal authority to support this contention.[19]

Indeed, in *Chicora*, this Court rejected a similar claim by the owner of an apartment building that had challenged, among other things, the calculation of its tapping fees as unreasonable and arbitrary. We concluded:

---

[19] The cases that Water Polo cites in response to the Authority's cross-appeal, *McGrath Construction, Inc. v. Upper Saucon Township Board of Supervisors*, 952 A.2d 718 (Pa. Cmwlth. 2008), and *Maxatawny Township v. Department of Environmental Protection* (Pa. Cmwlth., No. 2369 C.D. 2014, filed October 16, 2015), are inapposite. Neither case involved the calculation of tapping fees, nor did they address how the certification of projected flows in a sewer planning module impacts tapping fees.

> [The building owner] argues that it was overcharged for sewage service because it was charged for twenty-seven EDUs per year when it only consumed between four and ten EDUs worth. The [building owner] ignores that *the [a]uthority set forth in the June 10, 1998, Rate Resolution that an EDU with respect to a residential customer was defined as any room, group or rooms or enclosure, occupied or intended for occupancy as separate living quarters for a family or other group of persons living together or by persons living alone. Each apartment unit meets the definition of an EDU. It is highly unlikely, if not impossible, that all of the residential units that would be assigned one EDU would consume an equivalent amount of water.* For instance, a person living alone would not consume as much as a family of six. However, once again, *the key is not the amount of the service used but rather the value of the service.*

*Chicora*, 922 A.2d at 994 (emphasis added).

In adopting Water Polo's novel position regarding tapping fees, the Trial Court reduced the number of EDUs assigned to the Property because it found that Water Polo was "paying more *per unit* than it cost [the Authority] to provide its capacity and collection related services, which is prohibited by the MAA." Trial Ct. Op., 3/18/22, at 5 (citing *J. Buchanan*, 231 A.3d at 1102) (emphasis added). However, nothing in *J. Buchanan* authorizes an authority to reduce the number of EDUs assigned to a residential customer based on projected flows in a sewer planning module. As explained above, the Authority assessed its costs, debt, system design capacity, and the customer's statutorily defined design capacity to determine the capacity part of its tapping fee, which is $4,030 *per EDU. See J. Buchanan*, 231 A.3d at 1103 ("When determining the [c]apacity part of the tapping fee, a municipal authority's cost per unit is multiplied by the new customer's 'required number of units of design capacity.'") (citation omitted). As the Authority points out, "the tapping fee calculation itself is what prevents an authority from charging [residential] customers more per unit (i.e.[,] per EDU) than the authority's cost per

27

unit/EDU to provide the service." Authority Br. at 18; *see J. Buchanan*, 231 A.3d at 1103. This Court has consistently upheld this method of calculating tapping fees as reasonable under the MAA. *See, e.g.*, *J. Buchanan*, 231 A.3d at 1102 ("We do not agree with Buchanan that [Section 5607(d)(24)(i)(C)(VII) of the MAA] prohibits a municipal authority from charging a commercial customer's tapping fee on an EDU basis."); *Chicora*, 922 A.2d at 994-95 (upholding a sewer authority's EDU classification system for determining tapping fees and rates); *Curson v. W. Conshohocken Mun. Auth.*, 611 A.2d 775 (Pa. Cmwlth. 1992) (rejecting a landowner's challenge to an EDU-based connection fee on the ground that the fee was not related to the actual cost of connection).[20]

Water Polo also asserts that the Authority's tapping fees were arbitrary and unreasonable because they were "well above and beyond Water Polo's actual usage." Water Polo Cross-Appeal Br. at 6-7. However, contrary to this assertion,

---

[20] At trial, Water Polo's engineering expert, Frederick Ebert, acknowledged that it is lawful for an authority to charge one EDU per dwelling unit, as follows:

> Q. . . . We had a lot of testimony today about these computations for sewer rental fees or tapping fees. You've reviewed the system that's used in [the Township]. Isn't it perfectly permissible to charge one EDU per dwelling unit?
>
> A. Yes, it is.
>
> Q. It's lawful?
>
> A. It's lawful.
>
> Q. It complies with the [MAA]?
>
> A. Yes.

N.T., 9/22/21, at 100; *see also J. Buchanan*, 231 A.3d at 1091 n.1 (noting that "*typically one EDU will correspond to one residence*") (emphasis added).

our case law holds that an authority's tapping or connection fee need not be based on actual consumption to be deemed reasonable. *See J. Buchanan*, 231 A.3d at 1101-02 (stating that Section 5607(d)(24) of the MAA "*does not*[] . . . *require the authority to make individualized assessments of the expected use of each customer*") (emphasis added); *Life Servs., Inc. v. Chalfont-New Britain Twp. Joint Sewage Auth.*, 528 A.2d 1038, 1041 (Pa. Cmwlth. 1987) (holding that a one-time contribution fee was reasonably related to the value of service rendered and observing that an authority need not establish its connection fee solely upon services actually consumed to be deemed reasonable). As this Court has recognized, the units of capacity required by a new customer must take into account "the value of the service rendered either as actually consumed or as readily available for use." *J. Buchanan*, 231 A.3d at 1105 (emphasis added); *see also Smith v. Athens Twp. Auth.*, 685 A.2d 651, 657-58 (Pa. Cmwlth. 1996) ("There is nothing in the [MAA's predecessor statute] which prevents the [a]uthority from imposing a tap-in fee as a means of financing construction of the entire sewer system. . . . This [C]ourt has held that such a fee is an appropriate method for securing financing for the project.").

Furthermore, the evidence at trial established that the projected flow in a sewer module is irrelevant to the calculation of tapping fees. The sewer module submitted to DEP certifies that an authority has the capacity to treat the expected sewage from a proposed land development project. Mr. Salisbury, the Authority's manager, testified that the sewer module is intended "for planning purposes" and agreed that the module has "nothing to do with" the Authority's calculation of tapping fees. N.T., 9/22/21, at 69-70, 75. Michael Kreiser, the Authority's chairman, also testified that the planning module submitted to DEP has nothing to do with the computation of tapping fees; rather, the gallons-per-day amount certified

29

in the module is "what you're basing the flows on for capacity issues." *Id.* at 156-57; *cf. Water Polo III*, slip op. at 14 ("Water Polo[ III]'s water consumption *and the sewage flow estimates* [*the a*]*uthority provided to DEP in sewer planning are not relevant to how [the a]uthority classifies Water Polo [III] for sewer rates*.") (emphasis added). Mr. Kreiser also testified that the Authority's residential tapping fee, as set forth in the Tapping Fee Resolution, is applied uniformly to *all* residential customers. N.T., 9/22/21, at 158; *see* R.R. at 310a.

Based on our review of the record and relevant law, we conclude that the Trial Court erred in deviating from the methodology set forth in the Authority's Tapping Fee Resolution by re-calculating Water Polo's tapping fees based on 158 EDUs, rather than 201 EDUs.[21] The Authority in this case applied the same methodology to determine its tapping fee rate as the authority in *J. Buchanan*, and our case law confirms that charging a tapping fee on a per-EDU basis, rather than on actual usage, is lawful under the MAA. We further conclude that Water Polo failed to prove that the Authority abused its discretion in imposing tapping fees or that its tapping fees were arbitrary or unreasonable under the MAA. *See J. Buchanan*, 231 A.3d at 1104.

### III. Conclusion

In sum, we conclude that: (1) the Trial Court erred in concluding that the Authority overcharged Water Polo for tapping fees in the amount of $146,364.20; (2) the Authority's monthly sewer charges imposed on Water Polo were reasonable and uniform under the MAA; and (3) Water Polo failed to establish that its constitutional rights were violated. Accordingly, we reverse the Trial Court's entry

---

[21] Notably, while Water Polo's sewer module identified "project flows" of 35,000 gallons per day, the module also stated that the Property encompassed "200 EDU[]s." R.R. at 422a.

of judgment in Water Polo's favor as to tapping fees and affirm its entry of judgment in the Authority's favor as to all remaining claims.

_____
ELLEN CEISLER, Judge

31

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Water Polo I, L.P.,         :
        Appellant    :
                          :
     v.               :  No. 360 C.D. 2022
                          :
West Hanover Township    :
Sewer Authority         :

Water Polo I, L.P.         :
                          :
     v.               :  No. 392 C.D. 2022
                          :
West Hanover Township Sewer :
Authority,            :
        Appellant    :

# **O R D E R**

AND NOW, this 15th day of August, 2023, the Judgment of the Court of Common Pleas of Dauphin County (Trial Court), entered March 18, 2022, is hereby AFFIRMED IN PART AND REVERSED IN PART. This Court hereby REVERSES the entry of judgment in favor of Water Polo I, L.P., as to tapping fees, and AFFIRMS the entry of judgment in favor of West Hanover Township Sewer Authority as to all remaining claims.

                                           _____
                                         ELLEN CEISLER, Judge